DAVID T. PROSSER, J.
¶ 1. This is a review of an unpublished decision of the court of appeals, reversing a judgment of conviction for a Milwaukee County homicide as well as a subsequent order denying post-conviction relief.
¶ 2. The case requires us to determine whether, in 1993, the Milwaukee County Circuit Court, Victor Manian, Judge, erred by excluding evidence proffered by the defendant, General Grant Wilson (Wilson), that a third party committed the homicide for which Wilson was being tried.
¶ 3. The law is well established that a defendant has due process rights under the United States and Wisconsin Constitutions to present a theory of defense to the jury. However, a defendant's ability to present specific evidence to support a defense at trial may be subject to conditions or limitations. When a defendant seeks to present evidence that a third party committed the crime for which the defendant is being tried, the defendant must show "a legitimate tendency" that the third party committed the crime; in other words, that the third party had motive, opportunity, and a direct connection to the crime. State v. Denny, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984).
¶ 4. In this case, the State accused Wilson of killing Evania (Eva) Marie (Marie) in the early- *200 morning hours of April 21, 1993. Before the shooting, Marie had been sitting in her car with Willie Friend (Friend), a man with whom she was romantically involved. They were parked outside an illegal after-hours club operated by Friend's brother.
¶ 5. According to Friend, General Grant Wilson pulled up in his gold Lincoln Continental, got out, approached Marie's car, and began firing a large-caliber handgun. Friend fled, narrowly avoiding bullets fired in his direction. An eyewitness, Carol Kidd-Edwards, saw Friend flee and saw a shooter fire an additional five to seven shots into the driver's side of Marie's car with a smaller-caliber handgun. Kidd-Edwards watched the shooter walk toward the passenger side of the gold Lincoln before leaving her line of sight. She then heard a car door close and saw the car speed away.
¶ 6. At trial, Wilson blamed Friend for Marie's murder. Wilson theorized that Friend had lured Marie to her car and kept her talking until an unknown assassin or assassins could kill her and frame Wilson for the crime.
¶ 7. To support this theory, Wilson attempted to introduce the testimony of two witnesses: Mary Lee Larson and Barbara Lange. Both Larson and Lange indicated they would testify that Friend had slapped and threatened Marie about two weeks before her murder. The circuit court ruled that the testimony was inadmissible because the issue was not who killed Marie, but rather, whether Wilson killed Marie. After a seven-day trial, the jury found Wilson guilty of first-degree intentional homicide (Marie) and attempted first-degree intentional homicide (Friend). On October 4, 1993, the court sentenced Wilson to life imprison *201 ment for the homicide plus 20 years of imprisonment for the attempted homicide.
¶ 8. In June of 1996, Wilson filed a postconviction motion seeking a new trial based on the court's decision to exclude Wilson's proffered testimony from Larson and Lange. The court denied the motion, and Wilson's attorney failed to file an appeal. In September of 2010, the court of appeals reinstated Wilson's direct appeal due to his counsel's error. In January of 2011, Wilson filed another motion with the circuit court seeking a new trial. The circuit court denied the motion, and Wilson appealed.
¶ 9. The court of appeals summarily reversed Wilson's conviction and the circuit court's order denying postconviction relief. The court determined that Friend had the opportunity to kill Marie and that the State failed to show that the circuit court's alleged error in not admitting Wilson's proffered evidence was harmless. State v. Wilson, No. 2011AP1803-CR, unpublished order (Wis. Ct. App. Oct. 22, 2013). The court reasoned that Friend's involvement could have been direct (i.e., Friend could have been the shooter himself) or indirect (i.e., Friend could have engaged a gunman or gunmen to kill Marie); and given the conflicting evidence, the State could not meet its burden of showing that there was no reasonable possibility that the circuit court's error contributed to the guilty verdict. The State appealed, and we granted review.
¶ 10. We reaffirm the Denny test as the appropriate test for circuit courts to use to determine the admissibility of third-party perpetrator evidence. However, we conclude that, for a defendant to show that a third party had the "opportunity" to commit a crime by employing a gunman or gunmen to kill the victim, the defendant must provide some evidence that *202 the third party had the realistic ability to engineer such a scenario. Here, Wilson has failed to show that Friend had the opportunity to kill Marie, directly or indirectly; consequently, it was not error for the circuit court to exclude Wilson's proffered evidence. Accordingly, we reverse.
I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY
¶ 11. Marie was shot to death in the 3200 block of North 9th Street in Milwaukee at about 5:00 a.m. on April 21,1993. Two weapons were used in the shooting: a .44 caliber gun and a .25 caliber gun. Marie was shot seven times in total: once in the chest and once in the back with the .44, and five times in the left front and side of her torso with the .25. Willie Friend was present at the shooting and was the principal witness against Wilson.
¶ 12. When police conducted an investigation at the crime scene, they recovered several bullets and bullet fragments: one .44 caliber jacketed bullet was found in the grassy area between the curb and sidewalk, a .44 caliber lead bullet was found nearby in the ground, another .44 caliber lead bullet was found in the front yard of an adjacent house on North 9th Street; four .25 caliber brass casings were found in Marie's car, one in the front seat area and three in the back.
¶ 13. The police investigation quickly focused on Wilson based on Friend's statement, shortly after the shooting, that Wilson was the shooter. Later that morning, Lieutenant Michael LaPointe of the Milwaukee Police Department, along with two detectives and other officers, went to Wilson's place of employment. *203 LaPointe informed Wilson that they were investigating a shooting, that he was a suspect, and that he was under arrest. Wilson gave the officers permission to search his two lockers at work as well as his car. The officers recovered pictures of the victim from one of the lockers and a .38 caliber revolver from the trunk of his car. Later, LaPointe and other officers searched Wilson's house and recovered a .357 caliber revolver from Wilson's bed. LaPointe also recovered two boxes that formerly contained .25 caliber handguns. Additionally, LaPointe recovered two .25 caliber cartridges from Wilson's home.
¶ 14. Detective Michael Young interviewed Wilson on April 22. Detective Young asked Wilson if he owned any .25 caliber handguns, and Wilson answered that he owned three .25 caliber Raven[1] semiautomatic pistols: police had custody of one, his mother had the second, and his brother had the third. None of the five weapons cited above was one of the murder weapons.
¶ 15. Detective Young also asked Wilson if he owned a .44 magnum revolver; Wilson answered that he did not. When Detective Young subsequently asked Wilson if he had ever owned a .44 magnum revolver, Wilson replied that he had not.
¶ 16. After Wilson denied owning a .44, police questioned Terry Jean Bethly, a friend of Wilson. Bethly informed the police that on April 3, 1993, she *204 and Wilson went to a shooting range and Wilson brought a .44 with him. Bethly stated that she bought ammunition for Wilson's .44 that day. Bethly also said that she had seen Wilson with the .44 on another occasion. Police also questioned Wilson's brother, who confirmed Wilson's possession of a .44. After learning this, Detective Michael Dubis questioned Wilson again regarding his ownership of a .44, but Wilson continued to deny ever owning or possessing one.
¶ 17. On April 26, the State charged Wilson with First-Degree Intentional Homicide While Possessing a Dangerous Weapon and Attempted First-Degree Intentional Homicide While Possessing a Dangerous Weapon.[2] He was bound over for trial after a preliminary examination. The State filed an information with the same charges on May 5, to which Wilson pled not guilty. Trial was scheduled for June 28, 1993. After pretrial motions, jury selection, and opening statements, testimony began on June 30. Below are highlights of the trial testimony.
A. Willie Friend's Testimony
¶ 18. At trial, Willie Friend testified that he entered into an intimate relationship with Marie in 1992, after having known her for about 12 years. On April 20, 1993, Friend asked Marie to pick him up at the Milwaukee County Courthouse after a child support hearing.[3] The time was around 4:00 or 5:00 p.m. The two drove to Marie's home in South Milwaukee after picking up some medication for Marie's mother. *205 Friend left after Marie lent him her car and he returned about 11:00 p.m. They briefly drove around the area, then headed to the north side of Milwaukee, stopping at a tavern "on 3rd and Center between Center and Hadley, I believe." They remained at the tavern, for "a few drinks," for "an hour or two."
| 19. Upon leaving the tavern, they drove west on Center Street and observed a gold Lincoln parked near another tavern. Friend said that Marie remarked that "there go General's car." Friend said he noted that the gold Lincoln had a license plate with "G-Ball" on it. When the prosecutor showed Friend a picture of Wilson's car, Friend identified Wilson's car as the car he had seen that night.[4]
¶ 20. Friend and Marie kept driving on Center Street to 17th, where they turned right to stop "at this chicken place" to get something to eat. They then drove to Friend's mother's house located at 3859 North 9th Street. They parked in front of the house to eat their chicken.
| 21. Soon Wilson pulled up in the same gold Lincoln that Friend had seen earlier. It had "the inside dash lights on." Wilson was driving with an unknown person in the front seat. Friend said he saw Wilson and identified him, although he had never seen him before except in a "picture photo" that Marie had shown him. After eyeing Marie's car, Wilson drove away. Three or four minutes later Wilson drove by again, which caused Marie to have, as Friend described it, a "hyper-reaction."
¶ 22. Friend testified that he and Marie remained at his mother's house for an hour or so before *206 Marie left in her car to return home. It was around 2:00 a.m. He testified that while they were at his mother's house, Marie expressed concerns about Wilson, with whom she was trying to end a relationship.
¶ 23. Afterwards, Friend walked south to the house of his brother, Larnell "Jabo" Friend, located at 3288 North 9th Street. Friend admitted under pressure that Jabo's house could be characterized as an "after hours place." About the time that Friend reached the house, Marie arrived and told Friend that Wilson had tried to run her off the road. She explained that Wilson walked up to her car holding a revolver and told her that if he saw her with Friend again, he would kill them both.
¶ 24. Marie and Friend stayed at Jabo's house for a while. Then, about 4:30 a.m., Friend walked Marie to her car. Marie's car was parked on the corner of 9th and Concordia, facing north, on the same side of the street as Jabo's house. After some time sitting in the car, Friend saw Wilson's car approach from the north and pull up directly across from Marie's car. Friend testified that he knew the car was Wilson's and was the same car he had seen earlier that night because of the color and fresh paint job, and because the car was "clean." Friend got out of Marie's car as Wilson's car approached, believing that Wilson wanted to talk to him about the situation. Friend testified that the only person he saw in the car was Wilson but that he could not say whether someone else was in the car.
¶ 25. Instead of talking, Wilson got out of the driver's side of the Lincoln and approached the driver's side of Marie's car with a "blue steel large revolver" in his left hand. Wilson started shooting, and Friend ducked down beside Marie's car, with the passenger door open between him and Wilson, then began run- *207 rung. A bullet went through the door, and bullets hit the concrete around Friend, causing dirt to fly up and hit him as he ran to a passageway between two houses.[5] Friend ran through the passageway and around a house, and heard about three or four gunshots in rapid succession from a smaller gun before hearing a car door slam and the fast acceleration of an engine.
¶ 26. When Friend returned to the street Wilson's car was gone. He found Marie lying across the seat sideways, facing the passenger side. After raising her up, Friend saw a large, bloody wound on Marie's chest. He then went to Jabo's house to tell him that Marie had been shot. A neighbor called for medical assistance, which arrived shortly thereafter.
¶ 27. Friend identified Wilson as the shooter at the crime scene. Later, at the police station, he identified Wilson in a photo lineup as the person who shot at him when he was next to Marie's car. Friend also told the police that Wilson was stocky and was wearing gold-rimmed glasses.
B. Carol Kidd-Edwards' Testimony
¶ 28. On the morning of April 21, 1993, Carol Kidd-Edwards, who lived at 3291 North 9th Street, was awake in her bedroom, putting on her shoes to take her husband to work. At about 5:00 a.m. she heard about five very loud, consecutive gun shots. When the shots began, she dove to the floor. When they *208 stopped, she ran to the window to see what was happening. She saw a man with a brown leather jacket, whom she later identified as Friend, running away from a car, which she later identified as Marie's car, parked on the corner across the street from her house. She then saw Friend "take[] refuge on the side between two houses, of a house directly across the street from [hers]." Kidd-Edwards testified that she did not see any objects in Friend's hand.
¶ 29. Kidd-Edwards' house was the third from the corner on the west side of 9th Street. She said she could see everything to the corner across the street but had an obstructed view of the street and sidewalk on her side of the street. She testified that she saw a "gold toned Continental, a mark version of the Continental" near the corner on her side of the street. When shown a picture of Wilson's car, Kidd-Edwards stated that his car appeared to be like the car she saw. In giving her description, she demonstrated considerable knowledge of Lincoln automobiles.
¶ 30. Kidd-Edwards testified that as Friend was running from Marie's car, she saw a man walking from the passenger side of the Lincoln, which was in a blind spot from her bedroom window. Kidd-Edwards described the man as "a brown toned color black man," "roughly six feet," with a "top fade" hairstyle. Kidd-Edwards stated that she did not remember whether the man was wearing glasses. She was unable to get a good view of the man's face.
¶ 31. As the man was walking towards Marie's car, Kidd-Edwards saw him "top load[] a gun" and pull back the top of the gun. The man approached the driver's side of Marie's car and fired five to seven shots into the car. They were not as loud as the previous shots, suggesting a smaller gun. Afterwards, the man *209 walked back towards the Lincoln into her blind spot. Although she did not see the man get into the car, she heard the door shut and saw the car quickly pull off and drive south, past her house. Kidd-Edwards testified that she could not see whether the man got into the passenger side of Wilson's car, but she could see the driver's side and did not see anyone get into that side of the car.
¶ 32. Kidd-Edwards stated that she did not see anyone other than the man firing the shots and Friend. After the Continental drove away, Kidd-Edwards heard Friend pound on her door and called 911 after Friend yelled repeatedly, "call 911, call 911." Kidd-Edwards stated that upon seeing the victim up close, she appeared to be pregnant. She later asked Friend whether the victim was pregnant, and he told her that she was.[6]
C. General Grant Wilson's Testimony
¶ 33. Wilson testified that he met Marie on June 18, 1988 and had maintained some sort of relationship with her until the time of her death. When asked whether he had ever been near Jabo's house on 9th Street, Wilson testified that Marie had driven by when he was in the car, pointed out the house to him, and said that if "something ever happened to her that. . . would be the place."
¶ 34. One of Wilson's defenses was that he was at home when the shootings occurred. Wilson relied on an alibi witness, Rosanne Potrikus, to support his story that he did not shoot Marie. Wilson testified that on *210 the night of the murder, he went to see Potrikus at a bar where she worked. He called the bar Throttle Twisters.[7] After Potrikus closed the bar, she and Wilson went to another bar in his car. After learning that that bar was closed, Wilson and Potrikus drove to a Kentucky Fried Chicken on Capitol Drive. Afterwards, Wilson testified that the two drove around Capitol Drive and then around 8th and 9th Streets.[8]
¶ 35. After Wilson dropped Potrikus off at her car, they drove west on Center Street toward the freeway. Wilson exited the freeway on Silver Spring Drive and drove to his home on 74th and Carmen, arriving sometime between 3:30 a.m. and 4:00 a.m.[9] He parked his car in the front of his house. Wilson stated that his roommate, Pedro Smith, was not home at that time. Wilson went to sleep on the couch and woke up around 5:15 a.m., and eventually got ready for work, which started at 7:00 a.m.[10]
¶ 36. Finally, when Wilson was questioned about whether the .44 he brought to the shooting range with Terry Bethly was his, he admitted to owning a .44 at *211 that time. He said it was a Smith and Wesson Magnum, not a Sturm Ruger (which apparently was the type of .44 used in the shooting). Wilson stated that he did not tell the truth to the police when they questioned him about ever owning a .44 because he did not have it in his possession at that time. Wilson testified that he brought the gun with him on his recent vacation to Florida, and on his way back to Wisconsin he stopped in Alabama and exchanged it for certain "illicit pleasures" from "drug dealers and pimps."[11]
D. Attempts to Introduce Third-Party Perpetrator Evidence
¶ 37. Mary Lee Larson testified that she knew Marie, Wilson, and Friend. When asked whether she noticed Marie act in any way that indicated she was afraid of Wilson, Larson stated, "No. Not recently." When Wilson's defense counsel, Peter Kovac, attempted to ask Larson whether Marie was afraid of Friend, the State objected and the court sustained the objection. The court allowed Attorney Kovac to make an offer of proof, during which Kovac asked Larson whether she heard Friend threaten Marie at any time during the two weeks leading up to her death. Larson responded, stating that one time, when Friend and Marie were at her house in her kitchen, Friend told Larson that "he had to keep Eva in check," and further, that "if she wouldn't be in check, he'd kill her, and she knew it." Then, Marie responded that "yes, he would." Additionally, when Attorney Kovac asked Larson whether she ever observed any physical contact between Marie and Friend, Larson stated that she saw Friend slap Marie at a motel room.
*212 ¶ 38. At the end of his offer of proof, Kovac stated that "Our theory is that it's Willie who did it." In response, the court stated, "The issue is really not who did it. The issue is whether the defendant did it." The court added, "The statement by this witness [Larson] about what happened sometime previous is, I believe, hearsay." The court reasoned that allowing Larson to testify would "cause the jury to speculate." Accordingly, the court sustained the State's objection to Larson's testimony. The court similarly excluded Barbara Lange's proffered testimony about Friend and Marie’s relationship and the threat Friend made to Marie in Larson's kitchen.
¶ 39. In closing arguments, Kovac stated that "Willie Friend should be a suspect." Kovac continued:
Now, I'll tell you, right from the beginning . .. Willie did not fire the shots. There were two people who came by in that car, at least two people. There was somebody in the driver's area seat. There was somebody in the passenger seat. Those two people shot and killed Eva. I don't know who those people are .... But I think when you look at what's going on here, it's reasonable to me that Willie was involved. Willie had her there at this location knowing that these guys were going to come by.
To support his theory, Kovac suggested that Friend thought Marie was pregnant with his child and that he wanted to avoid another child support case. Kovac also suggested that the shots fired at Friend were for show, to make it look as though he was in harm's way when he was not.
E. Jury Verdict and Postconviction Proceedings
¶ 40. On July 8, 1993, the jury found Wilson guilty of both counts. At the sentencing hearing on *213 October 4, 1993, the court sentenced Wilson to life in prison with parole eligibility after thirty years for the first count, and to a maximum of twenty years, consecutive to his first sentence, for the second count.
¶ 41. On June 3, 1996 — almost three years later —Wilson filed a postconviction motion requesting a new trial. Wilson alleged that the trial was fundamentally unfair and denied him his right to present a complete defense. He also claimed newly discovered evidence not available at the time of trial substantiated his theory of defense and undermined the theory of the prosecution. The court denied this motion without a hearing. The court concluded that the reasons set forth on the record sufficed for not allowing Wilson to introduce the proffered evidence to support his theory that Friend was involved in Marie's murder. The court further determined that Wilson did not provide any evidence to support his claim of new evidence.
¶ 42. Wilson did not file an appeal of the circuit court's ruling on his postconviction motion. However, in a 2010 petition for a writ of habeas corpus, Wilson alleged that his counsel performed deficiently and abandoned Wilson by failing to pursue appellate review of the court's denial of Wilson's motion.[12] On September 14, 2010, the Court of Appeals granted Wilson's petition and reinstated his postconviction and appellate rights, concluding that Attorney Kovac provided ineffective assistance of counsel to Wilson.
¶ 43. On January 24, 2011, Wilson filed another motion for postconviction relief, requesting a new trial. In this motion, Wilson alleged that his constitutional rights were violated through ineffective assistance of *214 counsel and judicial error. Wilson argued that, under the standard adopted in Denny, "Willie . . . had the opportunity — in time and place — to have participated in Eva's killing" and that Willie had a motive to kill her. Wilson grounded one of his ineffective assistance of counsel claims on counsel's alleged failure to make a comprehensive offer of proof before trial and to show the court why available evidence satisfied the Denny standard so as to make Mary Lee Larson's and Barbara Lange's testimony regarding Friend's relationship with Marie admissible.
¶ 44. Once again, the court denied Wilson's motion for postconviction relief.[13] The court determined that Wilson's trial counsel was not ineffective for failing to proffer certain evidence that third parties might have committed the offense and for failing to explain why that evidence was admissible. The court concluded that it was not reasonably probable that the trial judge would have admitted the proffered evidence, as it would have been deemed either insufficient to satisfy Denny or inadmissible hearsay.
¶ 45. Wilson appealed, arguing that he was denied a meaningful opportunity to present a complete defense during his criminal trial because the court would not allow him to introduce third party perpetrator evidence. The court of appeals recognized the importance of Denny, stating,
Evidence that a person other than the defendant committed the charged crime is relevant to the issues being tried, and thus admissible, "as long as motive and opportunity have been shown and as long as there *215 is also some evidence to directly connect a third person to the crime charged which is not remote in time, place or circumstances."
State v. Wilson, No. 2011AP1803-CR, unpublished order, at 3 (Wis. Ct. App. Oct. 22, 2013) (quoting Denny, 120 Wis. 2d at 624).
¶ 46. The court of appeals then noted that the State conceded that Wilson's offer of proof was arguably sufficient to establish that Friend had a motive to kill Marie and that Friend's presence at the scene of the crime established that Friend had a direct connection to the crime. Id. at 6. However, the court rejected the State's position that Friend did not have the opportunity to commit this crime. Id. at 7. The court concluded that a "review of the evidence shows that Friend had the opportunity to commit this crime, either directly by firing the first weapon or in conjunction with others by luring Marie to the place where she was killed." Id. The court stated that "[u]nder Denny, Wilson should have been allowed to introduce evidence that Friend was involved in Marie's murder." Id. The court ultimately reversed Wilson's conviction and the circuit court's order denying postconviction relief, and remanded the case for further proceedings. Id. at 11. The State sought review, and this court granted review on November 5, 2013.
II. STANDARD OF REVIEW
¶ 47. This court reviews a circuit court's decision to admit or refuse to admit evidence for an erroneous exercise of discretion. Weborg v. Jenny, 2012 WI 67, ¶ 41, 341 Wis. 2d 668, 816 N.W.2d 191. When the circuit court's denial of admission of the proffered *216 evidence implicates a defendant's constitutional right to present a defense, however, the decision not to admit the evidence is a question of constitutional fact that this court reviews de novo. State v. Knapp, 2003 WI 121, ¶ 173, 265 Wis. 2d 278, 666 N.W.2d 881, vacated and remanded, 542 U.S. 952 (2004), reinstated in material part, 2005 WI 127, ¶ 2 n.3, 285 Wis. 2d 86, 700 N.W.2d 899.
III. DISCUSSION
¶ 48. Although a circuit court generally has the discretion to deny the admission of evidence, that discretion is subject to constitutional limitations; a circuit court may not refuse to admit evidence if doing so would deny the defendant's right to a fair trial. Crane v. Kentucky, 476 U.S. 683, 689-90 (1986). Nevertheless, evidence offered by a defendant in his own defense must be relevant. Milenkovic v. State, 86 Wis. 2d 272, 286-87, 272 N.W.2d 320 (Ct. App. 1978). It is this tension between the defendant's rights and the relevancy requirement that the court of appeals addressed in Denny.
¶ 49. Denny involved the conviction of Kent A. Denny for the murder of Christopher Mohr. Denny, 120 Wis. 2d at 617. Denny and his brother were accused of stabbing Mohr 57 times. Id. At trial, Denny attempted to introduce evidence that he had no motive to hill Mohr, but others did. Id. at 621. The circuit court refused to allow Denny to present the evidence, ruling it was irrelevant. Id. Denny appealed, claiming that the court's refusal to allow him to introduce the evidence was a violation of his constitutional right to present a defense. Id. at 621-22.
*217 ¶ 50. The court of appeals stated that it was a "general rule . . . that evidence of motive of one other than the defendant to commit the crime can be excluded when there is no other proof directly connecting that person with the offense charged." Id. at 622. The court looked to the California case of People v. Green, 609 P.2d 468 (Cal. 1980), to support its position. It agreed with the California Supreme Court that the purpose of limitations on the admission of evidence as to the possible motive of a third party is to "place reasonable limits on the trial of collateral issues . . . and to avoid undue prejudice to the People from unsupported jury speculation as to the guilt of other suspects . . . ." Denny, 120 Wis. 2d at 622 (quoting Green, 609 P.2d at 480) (alterations in original). The Denny court disagreed, however, with California's requirement that evidence connecting a third party to the crime be "substantial," holding that standard to be unfair to defendants.[14] Id. at 623.
¶ 51. The court of appeals instead turned to Alexander v. United States, 138 U.S. 353, 356 (1891), and the "legitimate tendency" test created in that case. To support the introduction of third-party perpetrator evidence under Alexander, the court of appeals explained, "there must be a 'legitimate tendency' that the third person could have committed the crime." Denny, 120 Wis. 2d at 623 (citing Alexander, 138 U.S. at *218 356-57). The court noted that the defendant need not establish the guilt of the third party to the level that would be necessary to sustain a conviction. Id. However, "evidence that simply affords a possible ground of suspicion against another person should not be admissible." Id. The Denny court thus created a "bright line standard requiring that three factors be present, i.e., motive, opportunity, and direct connection" for a defendant to introduce third-party perpetrator evidence. Id. at 625.
¶ 52. We ratified the Denny test in Knapp, 265 Wis. 2d 278, ¶¶ 175-183, noting the constitutional underpinnings of the standard in United States Supreme Court precedent. Id., ¶ 178 (citing Alexander, 138 U.S. 353). Indeed, since Knapp, the Supreme Court has gone on to cite the Denny case with approval. See Holmes v. South Carolina, 547 U.S. 319, 327-28 n.* (2006). We now reaffirm that the Denny test is the correct and constitutionally proper test for circuit courts to apply when determining the admissibility of third-party perpetrator evidence.
¶ 53. We pause to note that each piece of a defendant's proffered evidence need not individually satisfy all three prongs of the Denny test. Some evidence provides the foundation for other evidence. "[Fjacts give meaning to other facts," and certain pieces of evidence become significant only in the aggregate, upon the proffer of other evidence. State v. Vollbrecht, 2012 WI App 90, ¶ 26, 344 Wis. 2d 69, 820 N.W.2d 443. "This is precisely why Denny requires that all three be shown before evidence of a third-party perpetrator is admitted at trial." Id.
*219 ¶ 54. Although the Denny case is sound in principle, it does not provide complete clarity as to the meaning and contours of two of its prongs. This ambiguity is understandable in light of the multitude of fact situations in which the Denny test may be employed. Denny is firm, however, that three factors be present, implying that "opportunity" and "direct connection" have distinct meaning. Thus, the fact that a person with a motive to commit the crime is present at the crime scene is not enough to satisfy both "opportunity" and "direct connection."
¶ 55. In theory, many people may qualify as having the opportunity to commit a crime by virtue of their presence at the crime scene or their presence (at the time of the crime) in the vicinity of the crime scene. But presence does not necessarily create either motive or direct connection; and presence does not necessarily move the defendant's theory beyond speculation, even when other evidence does not eliminate a third-party as having the opportunity to commit the crime.
¶ 56. Essentially, the Denny legitimate tendency test requires a court to answer three questions.
¶ 57. First, did the alleged third-party perpetrator have a plausible reason to commit the crime? This is the motive prong.
¶ 58. Second, could the alleged third-party perpetrator have committed the crime, directly or indirectly? In other words, does the evidence create a practical possibility that the third party committed the crime? This is the opportunity prong.
*220 ¶ 59. Third, is there evidence that the alleged third-party perpetrator actually committed the crime, directly or indirectly? This is the direct connection prong. Logically, direct connection evidence should firm up the defendant's theory of the crime and take it beyond mere speculation. It is the defendant's responsibility to show a legitimate tendency that the alleged third-party perpetrator committed the crime.
¶ 60. A person's presence at the crime scene may be analyzed under "opportunity" but the opportunity prong may be eliminated during this analysis because of additional information. A person's presence at the crime scene also may be analyzed under the third prong, direct connection. What must be stressed is that "presence" alone will normally not satisfy both of these distinct prongs.
¶ 61. To provide additional guidance, we will discuss the three prongs one by one, keeping in mind that it is unconstitutional to refuse to allow a defendant to present a defense simply because the evidence against him is overwhelming.
A. Motive
¶ 62. Circuit courts often encounter the question of motive in homicide cases. A defendant's motive to commit a homicide is widely considered to be relevant. See D.E. Buckner, Necessity That Trial Court Charge Upon Motive in Homicide Case, 71 A.L.R.2d 1025 (1960). " 'Motive' refers to a person's reason for doing something .... Evidence of motive does not by itself establish guilt." Wis JI — Criminal 175. Motive is not an element of any crime; rather, motive "may be shown as a circumstance to aid in establishing" a particular person's guilt. Id.
*221 ¶ 63. The admissibility of evidence of a third party's motive to commit the crime charged against the defendant is similar to what it would be if that third party were on trial himself. Because motive is not an element of any crime, the State never needs to prove motive; relevant evidence of motive is generally admissible regardless of weight. See State v. Berby, 81 Wis. 2d 677, 686, 260 N.W.2d 798 (1977). The same applies to evidence of a third party's motive — the defendant is not required to establish motive with substantial certainty. Evidence of motive that would be admissible against a third party were that third party the defendant is therefore admissible when offered by a defendant in conjunction with evidence of that third party's opportunity and direct connection.
¶ 64. It may be that the strength and proof of a third party's motive to commit the crime is so strong that it will affect the evaluation of the other prongs. Nonetheless, the Denny test is a three-prong test; it never becomes a one- or two-prong test.
B. Opportunity
¶ 65. The second prong of the "legitimate tendency" test asks whether the alleged third-party perpetrator could have committed the crime in question. This often, but not always, amounts to a showing that the defendant was at the crime scene or known to be in the vicinity when the crime was committed.
¶ 66. As a legal concept, "opportunity" appears in the Wisconsin Statutes in the context of "other acts" evidence. See Wis. Stat. § 904.04(2):
(2) OTHER CRIMES, WRONGS, OR ACTS.. . . [E]vidence of other crimes, wrongs, or acts is not *222 admissible to prove the character of a person in order to show that the person acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
(Emphasis added.)
¶ 67. The analysis of other acts evidence to demonstrate opportunity applies to third-party perpetrator evidence:
The case law as well as § 904.04(2) permits the introduction of other act evidence to show a person's (whether a party or third person) "opportunity" to engage in certain conduct. "Opportunity" is a broad term . ..; proof of opportunity may be relevant to place the person at the scene of the offense (time and proximity) or to prove whether one had the requisite skills, capacity, or ability to carry out an act. ... It is incumbent on the proponent, however, to show the relevance of the "opportunity" evidence.
7 Wis. Prac., Wis. Evidence § 404.7 (3d ed.) (footnotes omitted).
¶ 68. The defense theory of a third party's involvement will guide the relevance analysis of opportunity evidence in a Denny case. If the third party is to be implicated personally as the shooter, then opportunity might be shown by the party's presence at the crime scene. See People v. Primo, 753 N.E.2d 164, 168-69 (N.Y. 2001) (evidence that the third party was at crime scene admissible in conjunction with ballistics linking third party to the weapon used). If the defense theory is that a third party framed the defendant, then the defense might show opportunity by demonstrating the third party's access to the items supposedly used in *223 the frame-up. Cf. Krider v. Conover, 497 Fed. Appx. 818, 821 (10th Cir. 2012) (third party's access to defendant's blood and hair samples only speculative evidence of opportunity without connecting third party to crime). In all but the rarest of cases, however, a defendant will need to show more than an unaccounted-for period of time to implicate a third party. Cf. Vollbrecht, 344 Wis. 2d 69 (a third party's unaccounted-for period of time enough to show opportunity in murder with extremely distinctive characteristics that also were present in a case in which the third party was convicted).
¶ 69. Overwhelming evidence against the defendant may not serve as the basis for excluding evidence of a third party's opportunity (or direct connection to the crime): "by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt." Holmes, 547 U.S. at 331. However, this holding does not govern situations in which overwhelming evidence demonstrates that the proposed third party could not have committed the crime. Courts are not evaluating the strength of only one party's evidence in such cases; they are in fact weighing the strength of the defendant's evidence (that a third party committed the crime) directly against the strength of the State's evidence (that the third party did not commit the crime).
¶ 70. Courts may permissibly find — as a matter of law — that no reasonable jury could determine that the third party perpetrated the crime in light of overwhelming evidence that he or she did not. Cf. People v. Pouncey, 471 N.W.2d 346, 350 (Mich. 1991) *224 ("When, as a matter of law, no reasonable jury could find that the provocation was adequate [to form the basis of a defense to the charge], the judge may exclude evidence of the provocation."). In sum:
While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.
Holmes, 547 U.S. at 326.
C. Direct Connection
¶ 71. "The 'legitimate tendency' test asks whether the proffered evidence is so remote in time, place or circumstances that a direct connection cannot be made between the third person and the crime." Denny, 120 Wis. 2d at 624 (citation omitted). No bright lines can be drawn as to what constitutes a third party's direct connection to a crime. Rather, circuit courts must assess the proffered evidence in conjunction with all other evidence to determine whether, under the totality of the circumstances, the evidence suggests that a third-party perpetrator actually committed the crime. See, e.g., Shields v. State, 166 S.W.3d 28 (Ark. 2004); State v. Oliver, 821 P.2d 250, 252 (Az. Ct. App. 1991) ("The defendant must show that the evidence has an inherent tendency to connect the other person with the actual commission of the crime.") (citation omitted); People v. Hall, 718 P.2d 99 (Cal. 1986). In sum, courts are not to look merely for a *225 connection between the third party and the crime, they are to look for some direct connection between the third party and the perpetration o/the crime.
¶ 72. As with opportunity, there are myriad possibilities how a defendant might demonstrate a third party's direct connection to the commission of a crime. For example, a third party's self-incriminating statement may be used to establish direct connection. See Erwin v. State, 729 S.W.2d 709, 714-17 (Tex. Crim. App. 1987). Exclusive control of the weapon used may also establish a direct connection. Primo, 753 N.E.2d at 168-69. Mere presence at the crime scene or acquaintance with the victim, however, is not normally enough to establish direct connection. See, e.g., State v. Eagles, 812 A.2d 124 (Conn. App. 2002).
D. Whether Wilson Satisfied the Denny Standard
¶ 73. The State conceded in its briefing to this court that Wilson satisfied the motive and direct connection prongs of the Denny test. We regret the State's concession of direct connection inasmuch as it has necessitated discussion of factors under the heading of opportunity that arguably belong under direct connection — and vice versa.
¶ 74. Friend's supposed motive was his belief that Marie was pregnant, that he was responsible for her pregnancy, and that he wanted to avoid future child support. The alleged direct connection was his relationship to Marie and his presence at the crime scene (in front of his brother's house) at the time of her death. Friend's presence at the crime scene might better have been analyzed under opportunity, raising the possibility that he could have committed the crime *226 as a conspirator and leaving his tenuous connection to the perpetration of the crime to be analyzed under direct connection. Because Friend's presence at the crime scene is not in dispute and because it has been consistently analyzed in this case as the direct connection, we assume without deciding that these two prongs have been satisfied.
¶ 75. This brings us to opportunity, which here must mean more than presence. If the opportunity prong has not been met, it was not error for the circuit court to refuse to admit the proffered evidence and we need go no further. See Denny, 120 Wis. 2d 614.
¶ 76. The State contends that "Wilson failed to show that Willie Friend had the opportunity to kill [Marie], either as the direct shooter or in conjunction with unknown persons he knew were planning to murder her."
¶ 77. The State argues first that Friend himself could not have been the shooter. It contends that the ballistics evidence on where the .44 bullets hit and were found, combined with the consistent testimonial evidence of Kidd-Edwards and Friend about the timing of the shots fired, shows it was "impossible" that Friend could have shot Marie with the .44, then have that gun shot at him by another, as he was running away. Both witnesses testified that the louder shots from the .44 were fired first and in rapid succession— "one right behind the other." Friend's hands were swabbed at the crime scene for gun shot residue, and the tests were negative. Shells were found in the area of Friend's observed flight.
¶ 78. Wilson counters that Friend could have been a "shooter" himself. He contends that ballistics evidence can be misinterpreted, that Friend and Marie *227 were in the car for a long time before the shooting such that his position in the car at the time of the shooting was unknown, and that Kidd-Edwards did not see the first shots fired. Wilson therefore concludes that any question as to whether the State's evidence showed Friend not to be the shooter goes to the weight of Wilson's evidence, not the admissibility of it.
¶ 79. We note that Wilson's theory throughout the trial was that Friend's involvement was indirect— that Friend hired Marie's killer or killers as a result of his motive to kill Marie to avoid child support or some other concern. Wilson did not suggest that Friend pulled the trigger himself. "Willie did not fire the shots," his counsel told the jury. The proffered evidence that the circuit court refused to admit did not support a direct shooter theory, in part, because it was logically inconsistent with Wilson's favored theory that Friend hired someone else to be the shooter. We see no reason to belabor the point.
¶ 80. The State also argues that Wilson has failed to show "how Friend had the opportunity to arrange for two unnamed gunmen ... to murder Eva [Marie]." The State relies on two points to support this argument. First, the "assailants" were driving the same type of car as Wilson. Second, the ballistics evidence and eyewitness testimony demonstrated that Friend was in real danger during the shooting; there was enough of a risk of harm to Friend that it is implausible that he hired someone to make him look like a victim in that manner.
¶ 81. Wilson counters that nothing in the evidence excluded the possibility that Friend hired one or more hit men to kill Marie, make Friend look like a victim, and frame Wilson for the murder. In support of this theory, Wilson points to the substantial period of *228 time — allegedly one to two hours — that Friend and Marie were in the car together prior to the shooting. Wilson claims this is evidence that Friend kept her there as a target for the shooters. Wilson also notes that Friend had time in his brother's house to arrange a hit on Marie. Here, Wilson relies on Vollbrecht, suggesting that Friend had a "limited but sufficient opportunity" under the Denny test to arrange for the murder.
¶ 82. Wilson argues that, for purposes of his defense, opportunity and direct connection are virtually the same thing; Friend's direct connection to the crime — his presence at the crime scene — also was his opportunity to commit the crime. As support, Wilson relies on Vollbrecht, where the court of appeals explained that "facts give meaning to other facts and . . . the significance of [the third party's] opportunity to commit the crime depends on his alleged motive and direct connection." Vollbrecht, 344 Wis. 2d 69, ¶ 26.
¶ 83. We are unpersuaded that Wilson has demonstrated a "legitimate tendency" that Friend committed the crime for which Wilson was convicted by hiring one or more persons to kill Marie. Denny's "legitimate tendency" test requires more than mere possibility. Denny, 120 Wis. 2d at 623 ("evidence that simply affords a possible ground of suspicion against another person should not be admissible"). Wilson in 1993 and Wilson now have failed to proffer any evidence that would elevate the theory of Friend's involvement in an assassination conspiracy from a mere possibility to a legitimate tendency.
| 84. Friend and Wilson testified at trial. Their accounts are reported in some detail in this opinion. Wilson was able to challenge Friend's credibility as a witness based on Friend's eight prior criminal convic *229 tions, his inconsistent testimony about the nature of his brother's business, and an overheard statement before the preliminary hearing in which he said to his mother that he "had to get his story together." Wilson challenged the accuracy of Friend's testimony about the shooter being left-handed and wearing gold-rimmed glasses. Nevertheless, the jury must have believed Friend. Wilson did not have much success in poking serious holes in Friend's account of the series of events on the evening of April 20 and early morning of April 21. In fact, Wilson's testimony confirmed Friend's testimony at several points — Friend's observation of Wilson's car at Throttle Twisters and Friend's testimony that Wilson drove by Marie's vehicle twice as it was parked in front of 3859 North 9th Street about 2:00 a.m. on April 21. Friend changed his story about the length of time that he and Marie sat in Marie's car before the shooting, from several hours to the period from about 4:30 a.m. until the shooting, after Friend reluctantly admitted that he and Marie spent most of that time in Jabo's house — the illegal after-hours club operated by his brother.
¶ 85. Against this background, Wilson has proffered no evidence demonstrating that Friend had the opportunity to arrange a hit on Marie during the relatively short time they were in Marie's car — no evidence that Friend had the contacts, influence, and finances to quickly hire or engage a shooter or shooters to gun down a woman on a public street. He has not shown that Friend or his alleged unnamed associates had access to a gold Lincoln Continental similar to Wilson's. He has not proffered any telephone records from Friend or Friend's brother's house that could have set up the time and place of the hit on short notice. He has not proffered any evidence of the own *230 ership by Friend or his family of .44 and .25 caliber weapons. He has not identified any individuals as being the shooter or shooters possibly employed by Friend. In short, he has not offered any evidence whatsoever indicating that Friend had the means or access or ability to hire assassins to kill Marie at a particular place within a relatively short time frame.
¶ 86. Wilson's reliance on Vollbrecht is misplaced. Vollbrecht involved two separate murders that shared extremely distinctive characteristics, reducing the need for a showing of opportunity to more than the third party's unaccounted-for time. Wilson has failed to show any similarity to a previous crime committed by Friend, his brother, or any associate of Friend's, distinguishing this case from Vollbrecht. Wilson was not excused from making an offer of proof as to opportunity beyond an unaccounted-for block of Friend's time. Because Wilson failed to make an adequate offer of proof as to Friend's opportunity, it was not error for the circuit court to refuse to admit Wilson's proffered evidence to avoid speculation that might confuse the jury.[15]
*231 ¶ 87. Because we determine there was no error in the circuit court's decision, we need not reach the question of whether any error was harmless.
IV. CONCLUSION
¶ 88. On trial for murder, General Grant Wilson developed a theory that someone else fired the shots that killed Evania Marie on April 21,1993. The details of this theory fit within the contours of the known facts of the case in a way that could not be readily disproved. However, even though the law does not require Wilson to prove that someone else committed the crime for which he was on trial, it does require more than a theory "that simply affords a possible ground of suspicion . . . ." Denny, 120 Wis. 2d at 623.
¶ 89. The "legitimate tendency" test ensures that proffered evidence meets the necessary evidentiary threshold before it is admitted while, at the same time, guarding the constitutional rights of defendants. The test requires a showing of the third party's motive, opportunity, and direct connection to the crime. Although proffered evidence should be understood in the context of other evidence, the three prongs of the "legitimate tendency" test are distinct from one an *232 other. Only in rare cases will the context dictate that a showing on one or two prongs is strong enough to lower the threshold for the showing on the third prong. This is not one of those cases.
¶ 90. We reaffirm that the Denny test is the appropriate test for circuit courts to use to determine the admissibility of third-party perpetrator evidence. However, we conclude that, for a defendant to show that a third party had the "opportunity" to commit a crime by employing a gunman or gunmen to kill the victim, the defendant must provide some evidence that the third party had the realistic ability to engineer such a scenario. Here, Wilson has failed to show that Friend had the opportunity to kill Marie, directly or indirectly; consequently, it was not error for the circuit court to exclude Wilson's proffered evidence. Accordingly, we reverse.
By the Court. — The decision of the court of appeals is reversed.

 Transcripts in the record describe this gun as a "Ravin," which is probably a misspelling by the court reporter. Raven Arms was a weapons manufacturer founded in 1970 that specialized in low-cost handguns. See Nicholas Freudenberg, Lethal but Legal: Corporations, Consumption, and Protecting Public Health 48 (2014). The Raven Arms MP25 was one of the guns most used in crimes in the 1990s. Peter Harry Brown and Daniel G. Abel, Outgunned: Up Against the NRA 157 (2010).

 Contrary to Wis. Stat. §§ 940.01(1), 939.32, and 939.63(l)(a)2. All subsequent references to the Wisconsin Statutes are to the 1991-92 version unless otherwise indicated.

 Friend testified that he had four children, three of whom were under the age of 18.

 Wilson's sister, Sandra Wilson, later testified that she located five other Lincolns in the community to discount the uniqueness of Wilson's car.

 Detective Dennis Kuchenreuther later corroborated the existence of bullets and scattered dirt in this area when he testified to the location of bullets in the ground, the presence of abrasions on the sidewalk, a gouge in the dirt, and scattered dirt on the sidewalk.

 Dr. Jeffrey Jentzen, the forensic pathologist assigned to the case, performed a complete autopsy on Marie and testified that she was not pregnant.

 In 1993 the Twisters bar was located at 508 West Center Street, Milwaukee.

 This testimony corroborated earlier testimony by Potrikus about her activities with Wilson that evening.

 Wilson's testimony about his movements coincides with Friend's testimony about where he and Marie saw Wilson's car that evening. Wilson, of course, did not admit that he drove by Jabo's house on North 9th Street at approximately 5:00 a.m.

 Detective Brian O'Keefe testified that Wilson told him he arrived at his home at 3:00 a.m. Pedro Smith testified that he woke up around 3:35 a.m. on April 21,1993 to go to work but did not see or hear Wilson anywhere in the house, including on the couch, and still did not see Wilson when he left for work at about 3:55 a.m. Smith also testified that he did not see Wilson's car in front of the house when he left for work.

 Neither of the weapons used in the murder was ever located.

 The Office of Lawyer Regulation publicly reprimanded Attorney Kovac in 2008 for violating multiple rules of professional conduct while representing Wilson.

 Milwaukee County Circuit Judge Jeffrey Conen presided.

 Two years after State v. Denny, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984), the California Supreme Court backtracked on the substantiality requirement: "To be admissible, the third party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt." People v. Hall, 718 P.2d 99, 104 (Cal. 1986) (en banc).

 At the court of appeals, Wilson also contended that the circuit court should have permitted him to introduce evidence implicating Larnell "Jabo" Friend in Marie's murder. The court of appeals did not reach this issue, basing its ruling instead on the proffered evidence about Willie Friend. State v. Wilson, No. 2011AP1803-CR, unpublished order, at 7 n.4 (Wis. Ct. App. Oct. 22, 2013). In cases where this court reverses the court of appeals and the court of appeals did not reach an issue, we will often remand the case for consideration of the issue not reached. See, e.g., State v. Sarfraz, 2014 WI 78, 356 Wis. 2d 460, 851 N.W.2d 235. However, "[o]nce [a] case is before us, it is within our discretion to review any substantial and compelling issue which the case presents." Univest Corp. v. General Split Corp., 148 Wis. 2d 29, 32, 435 N.W.2d 234 (1989).
*231 Because the issue involving Jabo is so similar to the issue involving Willie (i.e., whether third-party perpetrator evidence should have been admitted), we see no need to remand to the court of appeals. At trial, Wilson's offer of proof regarding Jabo was that Marie "had been working as a prostitute, that her pimp was Jabo, [and] that she was trying to get out." Although this offer of proof suggested a possible motive, it described no opportunity or direct connection for Jabo to have perpetrated the crime. In short, Wilson's proffered evidence about Jabo offered little more than "a possible ground of suspicion"; accordingly, we hold that it was not error for the circuit court to exclude it. See Denny, 120 Wis. 2d at 623.