COURT OF APPEALS
DECISION
DATED AND FILED

December 23, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1301-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2015CF2352

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

DENNIS B. HASSEL,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Dane County: ELLEN K. BERZ, Judge. *Affirmed*.

Before Blanchard, P.J., Fitzpatrick, and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   Dennis Hassel appeals a judgment of conviction for first-degree intentional homicide.  He also appeals the circuit court's order denying

his motion for a new trial. Hassel asks us to exercise our discretion to grant a new trial in the interest of justice. He argues that the real controversy was not fully tried because the jury was not presented with important fingerprint evidence of a third party's guilt. Hassel contends that this evidence was admissible pursuant to *State v. Denny*, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984). *Denny* requires the application of a three-prong test in which the defendant must show the third party's (1) motive, (2) opportunity, and (3) "direct connection" to the crime. *See id.* at 625. Hassel does not persuade us that he has satisfied the *Denny* test and, consequently, he does not persuade us that we should exercise our discretion to order a new trial in the interest of justice. We affirm the circuit court.

## *Background*

¶2 Hassel was convicted of first-degree intentional homicide for the murder of Larry Ewing. Ewing's dead body was found in Ewing's Madison apartment by a neighbor on April 18, 2015. The medical examiner concluded that Ewing's cause of death was "manual strangulation and/or suffocation."

¶3 The evidence against Hassel was largely circumstantial. The parties describe the evidence in great detail in their briefing filed in this court. We need not exhaustively repeat all of that evidence here but, for context, we will summarize some of it.

¶4 At relevant times, Hassel was on supervision and wearing a GPS monitoring device. As a result, there was evidence establishing his location at specific times. Additionally, there was surveillance video footage of Hassel at certain locations.

2

¶5    It appeared that Ewing and Hassel were involved in an intimate relationship. GPS data showed that Hassel had visited Ewing's apartment building on a number of occasions in early 2015. Prior to that, the two men had discussed spending the Christmas holidays together. A stain found on a comforter in Ewing's apartment was shown to contain Hassel's sperm.

¶6    On April 15, 2015, and April 16, 2015, Hassel made multiple visits to Ewing's apartment building. On April 15, 2015, he traveled to the apartment building and was inside the building from 9:42 a.m. to 11:16 a.m. He then traveled to a Target store, and after that he returned to Ewing's apartment building and was inside the building from 12:02 p.m. until 12:17 p.m. At around 2:00 p.m., Hassel went to a pawn shop where he pawned several items including two watches and other jewelry. He then returned to Ewing's apartment building for several minutes.

¶7    On April 16, 2015, Hassel returned to the area of Ewing's apartment building and remained outside from 9:04 a.m. until 9:38 a.m. He returned once more to the building from 2:09 p.m. until 2:28 p.m. and went inside.

¶8    Hassel attempted to conceal his visits to Ewing's apartment building. At times, he informed staff at the halfway house where he lived that he was going to a Red Cross facility that was near Ewing's apartment to donate blood or to apply for a job. The Red Cross's records showed that Hassel had not donated blood or applied for a job there.

¶9    The jury was informed that the parties stipulated that testing of items collected from Ewing's apartment revealed no fingerprint evidence for identification purposes. During closing arguments, the prosecutor asserted that, if somebody else had been the perpetrator, it must have been "somebody who left no trace."

3

¶10     Subsequent to his conviction and sentencing, Hassel filed a motion for postconviction discovery seeking testing of additional items collected from Ewing's apartment. Specifically, Hassel sought fingerprint and DNA testing of a bottle of Korbel brandy and a plastic cup. The items had been next to each other on a countertop, and the cup contained a dried brownish or "off-color" liquid.

¶11     The circuit court ordered testing. The testing revealed a forefinger print and thumb print belonging to a man named Leo Cowan on the brandy bottle and DNA belonging to Ewing on the plastic cup.

¶12     With this new information, the police conducted an investigation into Cowan. They learned that Cowan had been in jail in Marathon County from April 13, 2015, through April 15, 2015. They also learned that, on April 16, 2015, Cowan informed his probation agent that he was in Madison and wished to have his case transferred to Dane County.

¶13     The police questioned Cowan. They informed Cowan of Ewing's murder and explained that someone had been convicted of the murder several years earlier, but that Cowan's fingerprints were subsequently discovered on a liquor bottle in Ewing's apartment. The police also informed Cowan that they believed Ewing had been killed on April 15, 2015, and they asked Cowan if he remembered whether he had been in Madison around that time.

¶14     Cowan told the police that he could not be sure but thought he had remained in Wausau for weeks after his release from the Marathon County Jail. He recalled coming to Madison to visit family on a couple of occasions around the time in question. Cowan further stated that he would have been in Madison "hustling" until he got sober around November 2014. He stated that by "hustling" he meant exchanging sex for money or drinks. Cowan initially stated that he did not recognize

4

Hassel from a photograph, but later changed his mind and stated that Hassel looked familiar and resembled someone else who engaged in hustling.

¶15    Cowan denied recognizing Ewing from a photograph, being in Ewing's apartment, or being familiar with the area around the apartment. When asked to explain how his fingerprints might be on a liquor bottle found in Ewing's apartment, Cowan stated that he and acquaintances would frequently share liquor bottles in the parking lot of a bar to avoid paying for drinks. Cowan stated that, at the end of the night, someone would always take the bottle home with any remaining contents. When asked if he drank Korbel, Cowan responded that he would drink "anything."

¶16    Hassel filed a motion for a new trial in the interest of justice in the circuit court. He contended that the real controversy was not fully tried because the jury was not presented with important evidence showing that Cowan could have killed Ewing. The circuit court denied Hassel's motion. We reference additional facts as needed below.

### *Discussion*

¶17    Hassel asks this court to exercise its discretion to grant a new trial in the interest of justice. He argues that the jury was not presented with important evidence of a third party's guilt that was admissible pursuant to *Denny*.

¶18    Pursuant to WIS. STAT. § 752.35 (2019-20),[1] we may exercise our discretion to order a new trial when the real controversy has not been fully tried. One way that the real controversy has not been fully tried is "when the jury was erroneously denied the opportunity to hear important evidence bearing on an important issue in the case." *State v. Avery*, 2013 WI 13, ¶38 n.18, 345 Wis. 2d 407, 826 N.W.2d 60.

¶19    We exercise our discretionary power to grant a new trial "'infrequently and judiciously'" and "only in 'exceptional cases.'" *Id.*, ¶38 (quoted sources omitted). In exercising this discretion, we independently review the record. *State v. Williams*, 2006 WI App 212, ¶12, 296 Wis. 2d 834, 723 N.W.2d 719.

¶20    As noted above, *Denny* establishes a three-prong test requiring the defendant to show a third party's (1) motive, (2) opportunity, and (3) "direct connection" to the crime. *See Denny*, 120 Wis. 2d at 625. The test is designed to determine whether the defendant has shown a "legitimate tendency" that the third party could have committed the crime. *See id.* at 623. The test does not require that the third party's guilt be established "with that degree of certainty requisite to

---

[1] WISCONSIN STAT. § 752.35 states:

> In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

sustain a conviction." *Id.* However, "evidence that simply affords a possible ground of suspicion against another person" is not admissible. *Id.* In *State v. Wilson*, 2015 WI 48, 362 Wis. 2d 193, 864 N.W.2d 52, our supreme court "reaffirm[ed] that the *Denny* test is the correct and constitutionally proper test for circuit courts to apply when determining the admissibility of third-party perpetrator evidence." *See Wilson*, 362 Wis. 2d 193, ¶52.[2]

¶21     The court in *Wilson* summarized the three prongs of the *Denny* test as follows:

> First, did the alleged third-party perpetrator have a plausible reason to commit the crime? This is the motive prong.
>
> Second, could the alleged third-party perpetrator have committed the crime, directly or indirectly? In other words, does the evidence create a practical possibility that the third party committed the crime? This is the opportunity prong.
>
> Third, is there evidence that the alleged third-party perpetrator actually committed the crime, directly or indirectly? This is the direct connection prong. Logically, direct connection evidence should firm up the defendant's theory of the crime and take it beyond mere speculation.

*Id.*, ¶¶57-59.

¶22     In *Wilson*, the court emphasized that the *Denny* test always requires the defendant to satisfy all three prongs. The test "never becomes a one-[ ]or two-prong test." *Id.*, ¶64. The court in *Wilson* also stated that "[o]nly in rare cases will

---

[2] Hassel appears to argue in the alternative that we should not follow *State v. Denny*, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984), because *Denny*'s application may deprive a defendant of the right to present a complete defense. He asserts that other jurisdictions have abandoned *Denny*-type rules that limit the use of third party evidence. We are bound by *Denny* and *State v. Wilson*, 2015 WI 48, 362 Wis. 2d 193, 864 N.W.2d 52 and, therefore, we reject Hassel's alternative argument inviting us not to follow *Denny*.

the context dictate that a showing on one or two prongs is strong enough to lower the threshold for the showing on the third prong." *Id.*, ¶89. Hassel does not contend that his case is such a case. Accordingly, we proceed from the premise that Hassel must fully satisfy all three prongs.

*Motive*

¶23 The motive prong of the *Denny* test requires a showing that the third party had a "plausible reason" to commit the crime. *See id.*, ¶57. "[T]he defendant is not required to establish motive with substantial certainty." *Id.*, ¶63.

¶24 In arguing that Cowan had motive, Hassel appears to theorize that Cowan and Ewing may have had a sexual encounter, and he argues that Cowan could have had a financial motive to steal from Ewing. Hassel asserts that there was evidence that Ewing pursued sexual relationships with a number of other men, typically African-American men who, like both Hassel and Cowan, had been incarcerated; that Ewing would flaunt his money to attract these men; and that Ewing would provide the men with gifts or money. Hassel further asserts that there was evidence that Cowan was financially needy, that Cowan admitted to exchanging sex for money, and that Cowan engaged in other dangerous conduct. Hassel theorizes that "Cowan could well have become angry and violent if Ewing was not willing to be as generous with him as he thought he should." Finally, Hassel argues that Cowan's financial motive was at least as plausible as the financial motive that the prosecution attributed to Hassel at trial.

¶25 The State asserts that there is little evidence that Cowan was financially needy at the time of Ewing's murder. It contends that Hassel's theory as to Cowan's motive is speculative. The State does not address Hassel's argument

that Cowan's financial motive was at least as plausible as the financial motive attributed to Hassel.

¶26     We note that Hassel points to no evidence that Cowan stole anything from Ewing.  By contrast, there was at least some evidence that Hassel stole jewelry from Ewing.  There was still other evidence that called into question whether the perpetrator's motive was primarily financial.  For example, although Ewing's apartment was left in a state of disarray with open cabinets and drawers, over $300 in cash had been left behind.

¶27     Having considered Hassel's theory of motive and the evidence, we conclude that Hassel has not made a sufficient showing on the motive prong of the **Denny** test.  Although Hassel's own motive or motives may have been unclear, we agree with the State that Hassel's theory as to Cowan's motive is speculative.

*Opportunity*

¶28     The opportunity prong requires a showing of a "practical possibility" that the third party committed the crime.  *See id.*, ¶58.  Hassel's theory as to opportunity is based on his contention that Cowan could have killed Ewing on April 16, 2015, when Cowan was no longer in the Marathon County Jail and had reported being in Madison.  The State counters that Cowan lacked opportunity because the evidence strongly indicates that Ewing was killed on April 15, 2015.

¶29     We agree with the State that the weight of the evidence points to April 15 as the date of Ewing's death.  Although the autopsy of Ewing's body did not rule out April 16 as the date of death, a number of circumstances pointed to April 15.  For example there was evidence that Ewing had used his bus pass at least twice per day during the weeks leading up to his murder, but did not use his pass

9

after April 14. There was also evidence that Ewing had not used his cell phone, iPad, or land line phone after April 13 or 14.

¶30    Hassel argues that there is other evidence that could support a conclusion that Ewing was killed on April 16. That evidence is equivocal and ambiguous by comparison. For example, Hassel asserts that there is evidence that Ewing's neighbor saw a man who matched Cowan's description knocking on Ewing's apartment door on April 16, 2015, at a time when GPS data showed that Hassel was not in the apartment building. However, as Hassel acknowledges, the neighbor testified at trial that the man he saw was Hassel.

¶31    Because the evidence strongly supports a conclusion that Ewing was killed on April 15, 2015, Hassel has not persuaded us that he satisfies the opportunity prong of the *Denny* test. Moreover, even if Hassel had shown both opportunity and motive, we would still conclude that he has not shown a direct connection for the reasons we discuss next.

*Direct Connection*

¶32    To satisfy the direct connection prong of the *Denny* test, the proffered evidence "should firm up the defendant's theory of the crime and take it beyond mere speculation." *See id.*, ¶59. "[C]ourts are not to look merely for a connection between the third party and the crime[;] they are to look for some direct connection between the third party and the *perpetration* of the crime." *Id.*, ¶71.

¶33    "No bright lines can be drawn as to what constitutes a third party's direct connection to a crime." *Id.* "Rather, circuit courts must assess the proffered evidence in conjunction with all other evidence to determine whether, under the

10

totality of the circumstances, the evidence suggests that a third-party perpetrator *actually committed* the crime." ***Id.***

¶34    Hassel argues that Cowan's fingerprints on the brandy bottle show a direct connection between Cowan and Ewing's murder. Hassel asserts that the presence of Cowan's forefinger print and thumb print, along with the presence of the nearby cup containing a dried brownish liquid, indicate that Cowan was drinking or pouring drinks out of the bottle just prior to Ewing's murder.

¶35    The State counters that Cowan's fingerprints show only that Cowan touched the bottle at some point in time. It argues that the fingerprints do not establish when, where, why, or how he touched it.

¶36    We conclude that Hassel has not shown a direct connection as required by ***Denny***. First, there is no direct connection between the bottle and the actual perpetration of Ewing's murder. Hassel points to no evidence to suggest that the bottle might have been used to commit the crime.

¶37    Second, given the nature of fingerprint evidence, the bottle's presence, even with the nearby cup, does not establish that Cowan handled the bottle around the time of the murder or that Cowan was inside Ewing's apartment around the time of the murder. As the State argues, the fingerprints on the bottle do not establish when or where Cowan touched the bottle. Further, even if the dried liquid in the cup suggested that someone had recently drunk from the cup or poured brandy

11

from the bottle, it was not necessarily Cowan. There were no fingerprints or DNA evidence connecting Cowan to the cup.[3]

¶38 Third, Cowan's statements to the police provided a plausible, innocent explanation for the presence of his fingerprints on the brandy bottle. To summarize, Cowan's statements indicated that he frequented a bar in Dane County with acquaintances at least through November 2014; that he and his acquaintances would share liquor bottles in the parking lot to avoid paying for drinks; and that someone would always take the liquor bottle with any remaining contents at the end of the night. Cowan also stated that he came to Madison on a couple of occasions to visit family closer to the time of Ewing's murder. These statements suggested that the liquor bottle could have been brought to Ewing's apartment by someone else prior to Ewing's murder.

¶39 Hassel questions Cowan's credibility and contends that Cowan's explanation makes no sense. This contention appears to be based on a faulty premise. The premise is that only Cowan, Hassel, or a mutual acquaintance named Rowe could have brought the bottle to Ewing's apartment. The premise is faulty because Cowan could have been drinking with any number of men, and any one of those men could have brought the bottle to Ewing's apartment. As Hassel has pointed out, there was evidence that Ewing pursued relationships with a number of other men.

---

[3] Hassel argues that there was evidence that Ewing had a penchant for neatness, and that this evidence makes it unlikely that Ewing would have kept a brandy bottle around for very long without wiping it down and smudging or erasing any fingerprints. This evidence consists of testimony that Ewing kept his apartment "clean," "neat and orderly," and "pretty immaculate" compared to other apartments. We are not persuaded that this evidence shows that it is unlikely that Ewing would have kept a brandy bottle around for a long period of time without wiping it down.

¶40    In sum, for the reasons explained above, Hassel does not persuade us that we should exercise our discretion to order a new trial in the interest of justice.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.