COURT OF APPEALS
DECISION
DATED AND FILED

February 1, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.** **2020AP1362-CR**

Cir. Ct. No. 2015CF2419

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**
**DISTRICT I**

STATE OF WISCONSIN,

      PLAINTIFF-RESPONDENT,

  V.

JOVAN T. MULL,

      DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: JONATHAN D. WATTS and JOSEPH R. WALL, Judges. *Reversed and cause remanded for further proceedings*.

Before Donald, P.J., Dugan and White, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  Jovan T. Mull appeals from an order denying his motion for a new trial following a remand for the postconviction court to hold a *Machner*[1] hearing on two of Mull's claims that he received ineffective assistance of counsel.  Following the hearing, the postconviction court denied Mull's claims that his trial counsel was ineffective for failing to present a third-party perpetrator defense and for failing to move to strike or move for a mistrial following hearsay testimony from a witness alleging that Mull was bragging about shooting the victim.  For the reasons set forth below, we conclude that Mull received ineffective assistance of counsel.  Therefore, we reverse the order of the postconviction court, and we remand this matter for a new trial.

## BACKGROUND

¶2    Ericka Walker was shot and killed during a party at her house on March 7, 2015.  Witness accounts described that, just prior to the shooting, a fight broke out between two partygoers, Davion Crumble and Vashawn Smyth,[2] when Crumble and Smyth bumped into each other.  Then, in an effort to escape the fight, Walker barricaded herself in her bedroom with Crumble and some others who had been involved in the fight.  The fight continued as people outside the bedroom tried to get in, and people inside the bedroom threw items at the people standing outside the door.  Ultimately, while Walker and others were in the

---

[1] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

[2] The record reflects both a spelling of "Smith" and a spelling of "Smyth."  We use the latter spelling because it was the spelling that Vashawn provided of his name during the trial.  Moreover, several of the individuals involved in this case were referred to using nicknames; however, there are no disputes over which person is associated with which nickname, and we refer to the individuals involved in this case by their legal names.

bedroom with the door closed, someone outside the bedroom fired multiple shots through the closed door, hitting and killing Walker.

### A. *The Police Investigation*

¶3 Several witnesses provided statements to the police about the shooting, and Smyth testified at the subsequent trial that he was originally arrested for the shooting. Smyth denied that he was the shooter, and he even denied that he was armed that night. Instead he identified both Mull and Tyler Harris as having guns that night. The police then turned their attention to Tyler Harris as a suspect based on the information provided by Smyth. Eventually, the police also turned their attention to Menjuan Bankhead as a suspect based on statements from witnesses describing that Bankhead was standing by the bedroom door and shouting "shoot into the door." Ultimately, the investigation led to Mull's arrest.

### B. *Mull's Jury Trial*

¶4 Mull was subsequently charged with first-degree reckless homicide for Walker's death. The matter proceeded to a four-day jury trial. The State called multiple witnesses at trial, including witnesses from the party and investigating officers. The defense did not call any witnesses, and Mull did not testify.[3] The jury found Mull guilty as charged.

---

[3] The defense filed a witness list that was substantially similar to the witness list filed by the State. During the trial, the defense indicated that it would not call any witnesses as a result of being unable to locate them. The State, having had many of the same witnesses on its list, echoed trial counsel's statement saying that it was similarly unable to locate certain witnesses, but the State did not provide the names of the witnesses that it was unable to locate.

¶5     At the trial, witnesses from the party testified that there was one shooter who fired multiple shots through the closed bedroom door. Smyth testified that he went to the party that night with Bankhead and Casie James, and he started fighting when Crumble bumped into him and someone pulled out a taser.[4] Smyth testified that the fight escalated into "a big brawl" between his friends and Crumble's friends. Smyth testified that the fight ended when Crumble left the room, and he saw two people—Mull and Tyler Harris—with guns in the living room.[5] Smyth then testified that he saw Mull pointing a gun towards the bedroom door just "[a]fter my people was fighting and everything." Smyth said he was near the bathroom and heard the shots fired, but he did not actually see Mull fire any shots. He also described that Mull was wearing a blue hooded sweatshirt that night and another partygoer, Sanchez Harris, was wearing a red hoodie. He testified that he was wearing a black hooded sweatshirt, and he has "tattoos everywhere, right arm, left arm, chest, neck," with a half sleeve on his right arm.[6] Smyth also testified that he was originally arrested for the shooting.

¶6     Sanchez Harris testified that he rode with Mull to the party that night and Mull told him that he was carrying a gun. Sanchez further described that Mull was wearing a red Wisconsin Badgers sweatshirt that night, and he further testified that the person he saw fire shots at the bedroom door was wearing a red hoodie and "Rock Revival" pants. At other points in his testimony, Sanchez said that he

---

[4] Smyth testified that he did not know the name of the person who bumped into him at the party. However, it is clear from the witness accounts that the fight broke out between Crumble and Smyth after the two bumped into each other.

[5] Witness accounts place the bedroom as located off the living room.

[6] Smyth was questioned at trial whether he had "a sleeve tattoo," and Smyth responded that he would consider the tattoo on his right arm to be "a half a sleeve."

did not actually see Mull fire any shots. Rather, he saw a person with dreads and a red hoodie fire the shots, and he said that Mull "probably did it" based on what he saw and Mull's statement during the car ride home that Sanchez "better not say anything." He also described that Smyth and Bankhead were involved in the fight that took place just prior to the shooting, and they were in the living room at the time the shots were fired.

¶7     Alphonso Carter testified that after the fight broke up and Walker pulled Crumble into the bedroom, "[i]t was like three dudes, and it was like one dude, say, okay, like, 'Shoot in there.' It was two dudes who had a gun, but only one dude shot." Carter placed these three men in the living room just outside the bedroom, and he testified that the shooter was the one wearing a white shirt and blue jeans. He subsequently identified Mull during a photo array and during the court proceedings as the one who fired shots at the door, but he admitted he only had a side profile of the shooter.

¶8     Desmand Butler testified that a fight broke out between Crumble and someone else that he did not know, and he described that the fight continued when Crumble and others retreated to the bedroom and started throwing items out of the bedroom. Then, Butler testified that he saw someone in the living room fire shots at the bedroom door, and he remembered that the shooter had dreads and was wearing a red Wisconsin Badgers sweatshirt. He also testified that he did not know the person who fired the shots, but that he had subsequently identified Mull as the shooter during a photo array conducted during the investigation. However, after seeing Mull in the courtroom during the trial, he testified that he no longer thought that Mull was the shooter because Mull had a different hairstyle, was a different height, and had different body language than the person he saw fire the shots that night.

¶9    Vachune Hubbard, an associate of Mull's who was not at the party, testified that Mull was the shooter and explained that he knew this because Mull had told him during a phone conversation that he "got to shooting" when the fight broke out.

¶10    Cheyenne Pugh, Walker's former girlfriend, also testified to information about the identity of the shooter that she received in the days after the shooting.  As Pugh testified at trial, she was not at the party and did not witness the shooting.   However, in the days following the shooting, she received condolences from members of the community along with information indicating that Smyth was the shooter and other information indicating that Mull was the shooter.  On cross-examination, trial counsel questioned Pugh further about where she received this information, and in response to a question asking who Pugh meant by "they," Pugh responded in part by saying, "And also another lady was telling me about him going—being in the hood bragging about it saying that he hit a lick over there on 35th and he killed the stud bitch."[7]

### C.    Postconviction Proceedings

¶11    Following his conviction, Mull filed a motion requesting a new trial on the grounds that he received ineffective assistance of counsel and in the interests of justice.  As relevant here, he argued that trial counsel should have presented a third-party perpetrator defense and argued that either Smyth, Tyler Harris, or Bankhead was the shooter.  Mull additionally argued that his trial counsel should have called several witnesses from the party to support this

---

[7] Pugh testified that a "stud" is "a female who dresses like a guy."

6

defense—including Keshawna Wright, Jalyn Lynch, Charles Cantrell, and Demon Harris—who provided information during the investigation either inculpating one of the other three suspects or exculpating Mull.[8] In particular, Mull argued that these witnesses placed either Smyth, Tyler Harris, or Bankhead outside the bedroom door with a gun and wearing the red sweatshirt that many described the shooter to be wearing. Mull also argued that one of the witnesses from trial, Pugh, provided testimony that warranted a motion to strike or a motion for a mistrial, and he contended that his trial counsel was ineffective for failing to take either action. The postconviction court denied the motion without a hearing.[9]

¶12 On appeal, we reversed the order denying Mull's motion and remanded the matter for a ***Machner*** hearing on Mull's claims of ineffective assistance of counsel noted above. ***State v. Mull***, No. 2018AP1349-CR, unpublished slip op. ¶1 (WI App July 23, 2019).

¶13 At the subsequent ***Machner*** hearing, trial counsel testified regarding his decision not to pursue a third-party perpetrator defense that either Smyth, Tyler Harris, or Bankhead was the shooter. Trial counsel testified that it was a strategic decision he made based on the difficulty he had in preparing the defense. He explained:

---

[8] Trial counsel's failure to present a third-party perpetrator defense and trial counsel's failure to present the named witnesses were argued as separate claims of ineffective assistance of counsel in the postconviction motion. However, as we noted in our previous decision, "we consider his ineffective assistance allegation as to a third-party perpetrator defense to embrace his allegation as to these five witnesses." ***State v. Mull***, No. 2018AP349-CR, unpublished slip op. ¶5 n.5 (WI App July 23, 2019).

[9] The Honorable Jonathan D. Watts presided over the trial and entered the judgment of conviction. The Honorable Jeffrey A. Conen entered the original order denying Mull's postconviction motion. The Honorable Joseph R. Wall presided over the ***Machner*** hearing and the order issued following the hearing.

> [P]art of the problem was the chance to interview some of these people. Especially some of the other people, it was difficult to locate using an investigator.
>
> We had attempted to interview other people; but specifically in this case, a lot of people had aliases and other names that usually don't come up in the phone book.
>
> ….
>
> And trying to get—locate some of these people was very difficult to the best of my memory.

However, trial counsel was unable to recall specific names of those witnesses he tried to locate. He further stated that even the State had trouble locating these same witnesses:

> But as the [S]tate even had them on their witness list, it was discussed that neither my investigator nor the [S]tate could locate these people at the time of trial.
>
> And, therefore, we also couldn't locate them prior to trial. So to properly put together this *Denny* motion would have been very difficult because I couldn't locate certain individuals.

¶14     As it specifically related to presenting a defense that Smyth was the shooter, trial counsel was questioned why he could not present the defense based on further questioning of Smyth during the trial. Trial counsel explained:

> There was a lot of credibility issues if I recall based upon this. As I said, trying to put together the investigation, that trying to obtain statements from certain individuals was very hard.
>
> Going with a reasonable doubt defense in this situation given the inability to reach certain people seemed to be a choice of defense.

Thus, trial counsel testified that he did not pursue a third-party perpetrator defense given the difficulties he encountered in putting such a defense together. Instead, trial counsel decided to present "a reasonable doubt defense." Trial counsel

described this defense as testing the credibility of the witnesses because "there was a lot of other people there giving conflicting statements as to who the shooter was." As trial counsel explained, "There were other people with guns in the party. There were other people who were shooting outside after the incident. Different people had identified other shooters, that there were different descriptions of outfits given by various people."

¶15 On the matter of Pugh's testimony, trial counsel testified at the hearing that he did not move to strike Pugh's testimony or move for a mistrial because

> [i]t was more attempting to attack the whole foundation of where this statement came from, the credibility of the witness, that we didn't have these text messages or, you know, where did these come from that this victim—this witness because of a relationship with the victim had motive to lie.

Trial counsel also explained that, in context, Pugh's testimony referring to Walker as a "stud bitch" was not as offensive as it appeared because that was Walker's nickname. Trial counsel testified:

> Because under the circumstances, I felt there was better ways to attack it and sometimes to raise—given all the other cast of characters that was in this trial, there was a lot of other unique twists and turns that if we brought too much attention to it versus just going to attacking the credibility and the motive of this witness it would bring too much attention to the jury.

¶16 The postconviction court denied Mull's motion following the hearing. Mull has again appealed the denial of his postconviction motion requesting a new trial.

9

**DISCUSSION**

¶17 On appeal, Mull argues that the postconviction court erroneously denied his motion because he received ineffective assistance of counsel. Mull additionally argues that the interests of justice require that he be granted a new trial. We conclude that Mull received ineffective assistance of counsel. Consequently, we do not address Mull's claim regarding the interests of justice. *See* **State v. Castillo**, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997) (stating that appellate courts should resolve appeals "on the narrowest possible grounds").

## I. Ineffective Assistance of Counsel

¶18 "Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant is guaranteed the right to effective assistance of counsel." **State v. Balliette**, 2011 WI 79, ¶21, 336 Wis. 2d 358, 805 N.W.2d 334. A defendant must show two elements to establish that his or her counsel's assistance was constitutionally ineffective: (1) counsel's performance was deficient; and (2) the deficient performance resulted in prejudice to the defense. **Id.**

¶19 "To demonstrate deficient performance, the defendant must show that his counsel's representation 'fell below an objective standard of reasonableness' considering all the circumstances." **State v. Carter**, 2010 WI 40, ¶22, 324 Wis. 2d 640, 782 N.W.2d 695 (citation omitted). Prejudice occurs when counsel's error is of such magnitude that there is a "reasonable probability" that but for the error the outcome would have been different. **State v. Erickson**, 227 Wis. 2d 758, 769, 596 N.W.2d 749 (1999). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' That requires a

'substantial,' not just 'conceivable,' likelihood of a different result." ***Cullen v. Pinholster***, 563 U.S. 170, 189 (2011) (citations omitted).

¶20    "An ineffective assistance of counsel claim presents a mixed question of fact and law." ***State v. Pico***, 2018 WI 66, ¶13, 382 Wis. 2d 273, 914 N.W.2d 95.  "We will not reverse the circuit court's findings of fact unless they are clearly erroneous." ***Id.***  "We independently review, as a matter of law, whether those facts demonstrate ineffective assistance of counsel." ***Id.***

### A.    Failure to Present a Third-Party Perpetrator Defense

¶21    Mull first argues that he received ineffective assistance of counsel because his trial counsel failed to present a third-party perpetrator defense.  In particular, Mull argues that his trial counsel should have presented a defense that either Smyth, Tyler Harris, or Bankhead was the shooter and his trial counsel should have presented the testimony of several additional witnesses to support this defense.  We agree, and we conclude that trial counsel was ineffective for failing to present a third-party perpetrator defense.

¶22    When a defendant is seeking "to present evidence that a third party committed the crime for which the defendant is being tried, the defendant must show 'a legitimate tendency' that the third party committed the crime; in other words, that the third party had motive, opportunity, and a direct connection to the crime." ***State v. Wilson***, 2015 WI 48, ¶3, 362 Wis. 2d 193, 864 N.W.2d 52 (quoting ***State v. Denny***, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984)).  All three factors must be present, and "the fact that a person with a motive to commit the crime is present at the crime scene is not enough to satisfy both 'opportunity' and 'direct connection.'" ***Id.***, ¶54.  Moreover, "presence does not necessarily

create either motive or direct connection; and presence does not necessarily move the defendant's theory beyond speculation[.]" *Id.*, ¶55.

¶23 Mull argues that evidence that his trial counsel failed to present at trial would have satisfied this standard. Specifically, Mull argues that his trial counsel should have presented evidence that shows that Smyth, Tyler Harris, and Bankhead all had motive, opportunity, and a direct connection to the shooting. As nearly all the witnesses at trial and in the investigation establish, Smyth and Bankhead were involved in the fight that immediately preceded the shooting, and several witnesses place both Smyth and Bankhead in front of the bedroom door wearing items of clothing similar to what the shooter is described to have worn. Several witnesses also indicate that there was a third man in this group, and statements taken by the police during the investigation—including those given by Smyth, Bankhead, and Tyler Harris—indicate that Tyler was with Smyth and Bankhead that night.

¶24 Thus, Mull contends that if anyone had a motive, opportunity, and direct connection to the shooting, it would have been Smyth and his two friends, and if anyone fit the description of the three men standing outside the bedroom door that night, it was Smyth, Bankhead, and Tyler Harris. In other words, the evidence Mull identifies meets the standard for a third-party perpetrator defense. The fight provided the "plausible reason to commit the crime," and the statements show that all three men were involved in the fight and were in the living room with guns provides a "practical possibility" that they committed the crime and "take[s] it beyond mere speculation." *See Wilson*, 362 Wis. 2d 193, ¶¶57-59.

¶25 One of the first witnesses Mull identifies as being a person trial counsel should have called is Keshawna Wright. During the investigation, Wright

12

provided a statement to the police that she saw the shooter, and she described the shooter as a black male with "short black afro hair, wearing a red and black hoodie sweat shirt," which fits Smyth's own description of what he testified he wore that night to the party. Wright also connected the fight directly to the shooting and Smyth when she described that the fight started when Crumble bumped into the shooter, words were exchanged, and the two began to fight. During a subsequent photo array, Wright also identified Smyth as the shooter and said she was "certain, absolutely certain, positive" about her identification.

¶26     As Mull contends, this witness alone would have provided a third-party perpetrator defense because Wright's statement demonstrates that Smyth had motive, opportunity, and a direct connection to the shooting. Based on Wright's testimony, Smyth was involved in the fight that immediately preceded the shooting, and Smyth was fighting opposite the individuals that retreated to the bedroom. Wright's testimony also placed Smyth at the bedroom door when the shots were fired, and she even identified Smyth as the shooter with absolute certainty. Nevertheless, Mull provides several other pieces of information in addition to Wright's statement that were uncovered during the investigation that could have been presented to mount a third-party perpetrator defense.

¶27     In addition to Wright, Demon Harris identified that there were two males at the party who were both wearing red shirts and claiming to have guns. He also stated that he saw three men trying to enter the bedroom. He described that one of these men was part of the fight and was wearing a black shirt and black

13

jeans, and another man was wearing a red long-sleeve shirt and black jeans.[10] Dejuan Harris provided a statement saying that he attempted to break up the fight by removing Crumble to the bedroom, but Crumble tried to throw things from the bedroom at the people he was fighting with and who were standing outside the door.[11] Based on the descriptions of the clothing provided, these statements would place Smyth and Bankhead at the bedroom door at the time of the shooting. Also, as further described below, Tyler Harris was identified as being with Smyth and Bankhead that night; therefore, a reasonable inference from these statements is that it was Smyth, Bankhead, and Tyler Harris trying to enter the bedroom when the shots were fired.

¶28     Further, Loretta Collins provided a statement to a similar effect, in which she described that one of the men in the fight threw things out of the bedroom at the men standing at the door. Collins then said she saw one of the men standing outside the bedroom door fire shots into the door. She described the shooter as having dreads and wearing a black hooded sweatshirt, which is again similar to how Smyth described the clothing he wore that night and places him at the bedroom door.

---

[10] James stated that Smyth was wearing a black hooded sweatshirt and dark jeans that night and Bankhead was wearing a red hooded sweatshirt with a Wisconsin Badgers logo. Smyth further testified that he had a black shirt on that night, and Bankhead provided a statement to police during the investigation that he was wearing a Wisconsin Badgers sweatshirt. Crumble also provided a statement that the person who bumped into him and that he fought with (Smyth) was wearing a black shirt.

[11] Crumble also provided a statement to police stating that one of the people in the room threw a bottle out the door and he swung the handle of a broomstick at the people standing outside the door.

¶29    Charles Cantrell also provided a statement indicating that he saw the shooter, and he described the shooter as wearing a red hoodie and black pants earlier in the night. He further stated that, at the time of the shooting, the shooter was no longer wearing the red hoodie, and Cantrell noticed that the shooter's arm was fully tattooed. Smyth described himself as having "tattoos everywhere, right arm, left arm, chest, neck," with a half sleeve on his right arm. Furthermore, Bankhead described in his statement that he was wearing a red hooded sweatshirt earlier in the night that was removed during the fight. Thus, Cantrell's statement also places Smyth and Bankhead at the bedroom door at the time the shots were fired, and indicates that either one could have been the shooter.

¶30    Even further, Jalyn Lynch placed Bankhead outside the bedroom door when she provided a statement to police wherein she described that Bankhead was armed and standing outside the bedroom door at the time of the shooting yelling, "Shoot through that motherfucker."[12]

¶31    Bankhead also provided a statement that he and Smyth were fighting at the party. Bankhead described that one of the people he was fighting with tased him, and Bankhead was injured again when he hit his head on the kitchen cabinet during the fight.[13] He also stated that he was wearing a red Wisconsin Badgers sweatshirt to the party that night, and Smyth was wearing Rock Revival pants.

---

[12] We note that this is a statement similar to the one given by Carter during the trial in which Carter testified that he saw three men, two of them armed, and one of them was yelling to shoot through the door.

[13] James provided a statement to police that Bankhead was bleeding badly after the fight, that he smeared blood on the car, and made a comment about "[b]eating their ass."

¶32    Additionally, Tyler Harris provided a statement to the police when he was interviewed following his arrest in which he says that he went to the party that night with Smyth, Bankhead, and James, and he was close by the shooter when the shots were fired. Bankhead also provided information to the police that Tyler Harris "hung around" Smyth that night, and Smyth told police during one of his interviews that he considered Tyler a "family member" and that Tyler told him that he had "emptied [his] clip" that night and needed to "stay low." These statements would then make Tyler Harris a plausible suspect as the third person seen standing outside the bedroom door with Smyth and Bankhead and, therefore, another possible shooter given that other witnesses indicated that Tyler Harris was armed that night.

¶33    In short, there were a number of witnesses who were interviewed during the police investigation who provided information that could have been used to present a defense that Smyth, Bankhead, or Tyler Harris was the shooter that night. As trial counsel testified at the *Machner* hearing, he did not present the evidence identified by Mull because he had difficulty locating the witnesses needed to support a defense that either of the three men was the shooter. He further testified that he worked with an investigator, who was unable to locate the witnesses, and the State, with its more abundant resources, was also unable to locate these witnesses.

¶34    We are not persuaded by trial counsel's testimony, and we conclude that trial counsel's performance was deficient for failing to pursue alternative means of presenting this evidence. As Mull contends, trial counsel could have expanded on testimony from witnesses, such as Smyth and Sanchez Harris, who already testified at trial to present a third-party perpetrator defense; trial counsel could have pursued other means of securing the witnesses for trial through a

subpoena or material witness warrant; and trial counsel could have sought admission of the police statements given by these witnesses during the investigation under WIS. STAT. § 908.045 (2019-20),[14] if they truly could not be found for trial and were, therefore, rendered unavailable.

¶35    The State argues that trial counsel's performance was not deficient because trial counsel chose to present a "reasonable doubt" defense after he encountered difficulties in locating witnesses and trial counsel's strategy choice is "unassailable." *See State v. Breitzman*, 2017 WI 100, ¶65, 378 Wis. 2d 431, 904 N.W.2d 93.    As the State also contends, a third-party perpetrator defense was "unavailable" because the witnesses could not be located, and the State specifically points to its own unsuccessful efforts to locate Wright in support.    It also argues that trial counsel's chosen strategy was reasonable because the prosecution's case was "relatively weak." *See Lema v. United States*, 987 F.2d 48, 54 (1st Cir. 1993).

¶36    Initially, we note that in making this argument, the State fails to refute Mull's argument that trial counsel could have sought admission of the witnesses' statements taken during the investigation under WIS. STAT. § 908.045. Thus, we consider the State to have conceded Mull's argument on this point by failing to refute it. *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (holding that failing to refute an argument constitutes a concession).    Moreover, we further reject the State's argument because trial counsel's strategic decision was objectively unreasonable

---

[14] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

given that he could have pursued any of the alternatives that Mull identified in order to present a third-party perpetrator defense. *See State v. Kimbrough*, 2001 WI App 138, ¶¶32-34, 246 Wis. 2d 648, 630 N.W.2d 752.

¶37 The State further argues that trial counsel's strategy was reasonable because the jury ultimately heard that Smyth, Bankhead, or Tyler Harris was possibly the shooter as a result of the "reasonable doubt" strategy and, thus, there is no appreciable difference between the trial strategy counsel chose and the third-party perpetrator defense. However, such references to any of these three individuals were opaque and minor in the overall context of the trial. Further, trial counsel never explicitly argued to the jury that one of them was the shooter, making these isolated references meaningless for purposes of the jury being able to identify them as potential shooters. In fact, the prosecutor specifically said that Smyth was not the shooter in opening statements, and with such a statement from the prosecutor, it makes it difficult to say the jury would have been able to understand any indirect references to another shooter.

¶38 Moreover, in pursuing the reasonable doubt defense, trial counsel merely highlighted the discrepancies and inconsistencies in the witness accounts without providing an alternative theory to explain those discrepancies. A decision to present a third-party perpetrator defense would have turned an argument that the witnesses gave conflicting descriptions of what Mull was wearing and what Mull was doing into a defense that it was someone other than Mull who was firing shots at the bedroom door. In fact, this was exactly how trial counsel presented the case to the jury when he turned the discrepancies about what the shooter was wearing into an issue of what was Mull wearing, while he was doing the shooting: "[W]e know from the State that there's only one shooter, but yet we've heard multiple

different versions of supposedly … my client being the shooter, but yet he's wearing all these different outfits."

¶39     "'[F]acts give meaning to other facts,' and certain pieces of evidence become significant only in the aggregate, upon the proffer of other evidence." *Wilson*, 362 Wis. 2d 193, ¶53 (citation omitted).   Without the additional facts Mull identifies now, the significance of any references to Smyth, Bankhead, or Tyler Harris as the shooter were not clear for the jury and, therefore, we reject the State's argument that there was no appreciable difference between trial counsel's chosen strategy and a third-party perpetrator defense.

¶40     We also conclude that Mull was prejudiced by trial counsel's deficient performance.  The State had multiple weaknesses in its case as a result of the inconsistencies in the witness accounts.[15]   For example, Sanchez Harris provided testimony that he saw the shooter and identified Mull as the shooter. However, he then provided further testimony contradicting himself when he said that he did not see the shots being fired.  Butler also specifically recanted his pretrial identification of Mull when he testified that Mull was not the same height and did not have the same body language as the shooter Butler witnessed at the party that night.  Moreover, the testifying witnesses provided differing accounts of what the shooter was wearing, and while multiple witnesses placed the shooter in a red hoodie, Smyth testified that Mull was wearing a blue hooded sweatshirt.  Had

---

[15] We note that in one breath, the State argues the prosecution had a relatively weak case, which made trial counsel's chosen strategy a reasonable one, and in another breath, the State argues that its case was strong enough that had the jury heard the additional evidence identified by Mull, the outcome would have been the same.  The State cannot have it both ways, and we will not consider the State's case relatively weak in order to defeat Mull's argument on deficient performance but then strong enough to defeat Mull's argument on prejudice.

Mull been able to present additional evidence that Smyth, Bankhead, and Tyler Harris were at the party together, involved in the fight, armed, and described as wearing attire similar to that of the shooter, there is a reasonable probability that the outcome would have been different. *See **Erickson***, 227 Wis. 2d at 769.

¶41     As a result of trial counsel's decision, Mull was denied the opportunity to present evidence of the full picture to the jury in a way that provided an explanation for those discrepancies to the jury. *See **State v. Domke***, 2011 WI 95, ¶60 & n.11, 337 Wis. 2d 268, 805 N.W.2d 364.  Had trial counsel presented the additional evidence that Mull identifies, the jury would have been presented with, for example, a witness account that placed Bankhead in the red hoodie the shooter was seen wearing and in front of the bedroom door, another witness account identifying Smyth as the shooter with absolute certainty, and another account that Tyler Harris "emptied [his] clip" at the party.  As it currently stands, the jury was provided with a picture of Mull being the shooter while witnesses disagreed on what Mull was wearing.  Had it heard this additional evidence, the jury would have been presented with other suspects to consider and provided the full picture in which it might have been someone else standing in front of that bedroom door.

¶42     It is the jury's obligation to weigh and assess the credibility of the evidence and resolve conflicts in the testimony when determining a defendant's guilt or innocence. *See **State v. Gomez***, 179 Wis. 2d 400, 404, 507 N.W.2d 378 (Ct. App. 1993).  Without the jury having knowledge of the evidence currently identified by Mull and the ability to weigh and assess these additional witness accounts, we cannot say with confidence that the jury was able to perform this function.  Consequently, we conclude that we cannot have confidence in the outcome of the trial, and that Mull was prejudiced by the failure to present a third-

party perpetrator defense because there is a reasonable probability that had the jury heard this evidence, the outcome of the trial would have been different.

### B. Failure to Move to Strike Pugh's Testimony or Move for a Mistrial

¶43   Mull next argues that he received ineffective assistance of counsel because his trial counsel failed to move for a mistrial after eliciting testimony from Pugh that Mull was "being in the hood bragging about it saying that he hit a lick over there on 35th and he killed the stud bitch." We again agree with Mull, and we conclude that trial counsel was ineffective for failing to move to strike this testimony and request a curative instruction in which the jury was told to disregard Pugh's statement.

¶44   Trial counsel testified at the *Machner* hearing that his overall trial strategy was to avoid bringing attention to this testimony offered by Pugh and discredit Pugh's testimony through other means, such as by highlighting that Pugh was not at the party, did not witness the shooting, and did not know many of the individuals who were offering her information about the shooter's identity.

¶45   We conclude that trial counsel's explanation is insufficient and his performance was deficient. First, a motion to strike is not inconsistent with trial counsel's stated trial strategy to discredit Pugh. Trial counsel could have both objected to Pugh's testimony that portrayed Mull as a remorseless killer who harbored animus against the victim and also argued to the jury that Pugh was not a credible witness because her testimony was based on hearsay. A stated strategy of discrediting the witness does not preclude trial counsel from objecting to statements portraying the defendant as bragging about killing the victim.

¶46    Second, trial counsel's cross-examination of Pugh did not accomplish his stated strategy. Trial counsel asked several open-ended questions that elicited unresponsive, narrative answers from Pugh and invited her to make prejudicial comments, such as the one challenged here. Such an approach was "incautious and inconsistent with any rational trial strategy," and was, therefore, deficient. *See Domke*, 337 Wis. 2d 268, ¶49.

¶47    We further conclude that trial counsel's deficient performance prejudiced Mull. As with the prior analysis, when we take into account the weaknesses in the State's evidence presented at trial, there is a reasonable probability of a different outcome had the jury been instructed to disregard Pugh's comment that Mull was "bragging" about killing the "stud bitch." We conclude that given the State's weak case against Mull, having a witness testify to a statement that Mull was bragging about the shooting and using a potentially derogatory name for the victim, that Mull has shown that there is a reasonable probability of a different outcome.

¶48    The State argues that trial counsel's failure to move to strike or move for a mistrial after Pugh's testimony is not prejudicial because Pugh explained that she did not know if the information was accurate, she did not know who told her this information, and she also explained that "stud bitch" was not a derogatory name in this context. We are not persuaded. Despite these contentions by the State, the fact still remains that the jury heard this information without explicitly being told it could not use it, and it resulted in the jury hearing a statement that Mull was bragging about killing the victim, regardless of what she was called. Thus, had the jury used this information in its deliberations, it would have amounted to the jury having a confession by Mull conveyed in a manner in which Mull is proud of what he did and lacked remorse for it. Had trial counsel

objected to Pugh's testimony and moved for a curative instruction directing the jury to disregard the testimony, the jury would not have considered the testimony in its deliberations. *See State v. Hurley*, 2015 WI 35, ¶92, 361 Wis. 2d 529, 861 N.W.2d 174. Consequently, we conclude that there is a reasonable probability of a different outcome if the jury had not heard this testimony from Pugh or was told to disregard it.

## CONCLUSION

¶49 In sum, we conclude that Mull received ineffective assistance of counsel as a result of trial counsel's failure to present a third-party perpetrator defense and failure to move to strike and for a curative instruction in response to Pugh's testimony. As to both claims of ineffective assistance of counsel raised on appeal, Mull has demonstrated both that trial counsel's performance was deficient and that he was prejudiced. Accordingly, we reverse the order of the postconviction court denying Mull's motion, and we remand this matter for a new trial.

*By the Court.*—Judgment and order reversed and cause remanded for further proceedings consistent with this decision.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.