COURT OF APPEALS
DECISION
DATED AND FILED

May 27, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP2506-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2022CF75**

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

RYAN LEWIS STEINHOFF,

   DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Dunn County: JAMES M. PETERSON, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Ryan Lewis Steinhoff appeals from a judgment of conviction, entered pursuant to a jury's verdicts following a bifurcated trial, for

first-degree intentional homicide with the use of a dangerous weapon, as a party to the crime and as a repeater.[1] On appeal, Steinhoff argues that the circuit court erred by excluding third-party perpetrator evidence, which deprived him of his constitutional right to present a defense. Relatedly, Steinhoff also asserts that the court erred by denying Steinhoff's motion to admit other-acts evidence regarding the nature and circumstances of the third-party perpetrator's past crimes. For the reasons that follow, we reject Steinhoff's arguments, and we affirm his judgment of conviction.

## BACKGROUND

¶2 On November 17, 2020, law enforcement discovered Brooks Monroe's badly beaten body in a trailer home in Dunn County.[2] The State alleged at trial that "after not sleeping for days, binging on as much methamphetamine as he could find, [Steinhoff] believed that [Monroe] was some sort of sex trafficker or some sort of predator." As a result, Steinhoff, along with Ashley Gunder and Chad Turgeson, took Monroe to a trailer owned by George Welch, where the State alleged that Steinhoff and Turgeson assaulted Monroe to "teach[]" him "a lesson," and Monroe died from his wounds.

---

[1] Steinhoff was also convicted of misdemeanor retail theft, as a party to the crime and as a repeater, and two counts of felony bail jumping, as a repeater. Because these convictions are not relevant to Steinhoff's appeal, we will not discuss them further.

[2] Pursuant to the policy underlying WIS. STAT. RULE 809.86 (2023-24), we refer to the homicide victim in this case by a pseudonym. Although homicide victims are excluded from the confidentiality rule set forth in RULE 809.86(4) (2023-24), we nonetheless apply the rule here to protect the privacy of the victim's family. *See* RULE 809.86(3), (5) (2023-24).

All references to the Wisconsin Statutes are to the 2023-24 version.

¶3     Before trial, Steinhoff moved to admit third-party perpetrator evidence, pursuant to *State v. Denny*, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984), alleging that Welch was the one who was actually responsible for Monroe's death.  Steinhoff's theory was that Monroe survived the beating, but Welch struck Monroe in the head with a hammer after Steinhoff left the trailer.  Steinhoff's motion alleged that Welch had a motive to kill Monroe because "Welch is a person who irrationally engages in violent behavior," as evidenced by his history of violent crimes, and because Welch sent a text message stating that he "felt better" as a result of Monroe's death; that Welch had the opportunity to kill Monroe because Welch was home at the time and Steinhoff alleged that Monroe was alive when he left Welch's residence; and that Welch had a direct connection to the crime because his DNA was the only other DNA located on a hammer that had Monroe's blood on it.

¶4     Steinhoff also filed a motion to admit other-acts evidence "related to" his *Denny* motion.  That motion sought to introduce evidence of Welch's past violent crimes, arguing that the evidence was relevant to motive, identity, and modus operandi.  *See **State v. Sullivan***, 216 Wis. 2d 768, 771-72, 576 N.W.2d 30 (1998).  The State opposed both motions.

¶5     The circuit court held a nonevidentiary hearing on the motions and, ultimately, denied the motions by oral ruling.  The court did not specifically address all of the purposes for which the other-acts evidence was offered, but it nevertheless concluded that Welch had no motive to kill Monroe because Welch's prior crimes "appear to be spontaneous eruptions of violence based on an interaction," but there was "absolutely no evidence of any interaction between George Welch and [Monroe]."  The court also determined that Steinhoff had failed to establish that Welch had a direct connection to the crime because "there's just

no evidence that [Welch] was involved with what was going on, other than his DNA being on his own property in his own home."

¶6      Steinhoff's case proceeded to a nine-day bifurcated jury trial.[3] Turgeson, Gunder, and Welch, among others, testified for the State. According to the trial testimony, Steinhoff, Turgeson, and Gunder were together consuming methamphetamine before Steinhoff and Gunder went to Monroe's residence. Monroe's roommate explained that they "chatted for a while" and "ended up hanging out for quite some time, playing cards." The roommate testified that during the visit, Steinhoff "consistently brought up questions about what had happened to [Monroe's son]" and was "asking questions about [child] trafficking," while "fidget[ing] with a knife." According to the roommate, Steinhoff consumed more methamphetamine, and Gunder testified that she also consumed more as well. Eventually, Steinhoff, Gunder, and Monroe left with Monroe's dog.

¶7      The group then drove to Welch's trailer, picking up Turgeson on the way. Welch was not home, but Gunder broke in through the window and let the others in. Turgeson described Welch's trailer as "trashed" and "a trap house," explaining that "[t]here was … four feet of refrigerator, open cans, needles, backpacks, furniture, you name it, mattresses all through the hallway." According to the trial testimony,[4] Steinhoff and Monroe went into the middle bedroom of the

---

[3] Steinhoff pled not guilty and not guilty by reason of mental disease or defect (NGI) to the charges. An NGI trial is bifurcated into two phases: the guilt phase and the responsibility phase. *See State v. Fugere*, 2019 WI 33, ¶26, 386 Wis. 2d 76, 924 N.W.2d 469.

[4] As the State explains, Gunder's and Turgeson's testimony differed as to the extent of Turgeson's involvement in the crime after they entered Welch's residence, but those differences are not relevant for the purpose of this appeal. We will address the testimony as it relates to Steinhoff.

trailer, and witnesses heard a "fist fight" and "somebody getting hit and yelling." Gunder testified that Steinhoff "was just trying to figure out where the sex ring was," and she remembered Monroe saying "he was sorry, that he did it" and also saying "he didn't do it."

¶8     Turgeson testified that Steinhoff came out of the room multiple times, that he had blood on his hands, that he was "pissed" and "aggressive," and that Steinhoff "was just not there" mentally and was "rambling." Monroe never emerged, but Turgeson stated that he looked into the bedroom and saw that Monroe had a "really bad bloody nose." Turgeson then went into the bedroom, moved "[a] huge pile of clothes" that was on the floor because "[t]here was stuff everywhere," and gave Monroe a "durag or a table cloth or wash cloth" for the blood. According to Turgeson, Steinhoff threatened him with a knife because he was asking too many questions about what was happening with Monroe.

¶9     For her part, Gunder testified that Steinhoff's demeanor was "angry" and that she had never seen Steinhoff "so angry before." She testified that she was asked to get a knife, and she retrieved a knife from Welch's bedroom. When Gunder saw the knife later, it had blood on it. Gunder also testified that she saw Monroe with "a lot of blood all over his face," that she heard Monroe screaming, and that she smelled "burning—like burning flesh or hair."

¶10    At some point during this time period, Welch returned to his trailer. According to Gunder, Welch "bust[ed] through the door, and [she] told him everything was okay … and then he calmed down." Welch testified that he did not expect anyone to be in his trailer and he asked, "[H]ow did you guys get in and how long have you been here?" Welch also testified that Gunder told him, "I don't think you want to go back there," meaning the middle bedroom, because

"someone's getting schooled." Welch then testified that he had a migraine and he went to lie down. Turgeson, Gunder, and Welch all testified that Welch went into a bedroom near the front of the residence, and all three stated that Welch never entered the middle bedroom. Gunder did assert that she thought Welch was "panicking" because he was "rocking back and forth on his bed."

¶11 Gunder testified that Monroe's "beating and torture" went on "[f]or hours." Eventually, Monroe stopped screaming, and Steinhoff left the middle bedroom and told Gunder that "[h]e wanted to light the house on fire," which she refused. Gunder observed that Steinhoff had blood on his hands and that they were "bruised and swollen." Gunder asked Steinhoff if she could keep Monroe's dog, and Steinhoff said she could. Gunder testified that after Steinhoff and Turgeson left Welch's residence, she never heard "any movement or noises coming from" the middle bedroom where Monroe was located.

¶12 When Gunder entered the middle bedroom, she found Monroe lying face down with a broken window on his back. After "cleaning up" some of "the mess," Gunder fell asleep on the couch until the next day. On cross-examination, Gunder was asked if she told law enforcement that Monroe was breathing when she went to sleep. She stated, "I don't remember that," but when pushed, she responded, "If I said it, then it probably happened."

¶13 For his part, Welch testified that when he woke up the next morning, he left his trailer without going into the middle bedroom, and he assumed that the others "all left because [he] didn't hear no commotion in that [middle bedroom] or anything like that." Welch eventually returned to his trailer in the afternoon with a friend, and Gunder and the friend checked on Monroe. The friend told Welch that Monroe was not looking good, and Welch called 911.

¶14 The assistant medical examiner, who autopsied Monroe, testified that he found multiple blunt force injuries to Monroe's "head, torso, [and] extremities" as well as two stab wounds. The examiner identified these injuries as Monroe's cause of death. When the examiner was asked whether one injury to Monroe's head was the fatal injury, he could not be sure due to the sheer number of injuries, which "took [him] three and a half pages to describe."

¶15 A DNA analyst who tested some of the items found in Welch's trailer also testified. He stated that both Welch's and Monroe's DNA was found on a knife and a hammer located at the residence, but no other DNA was conclusively found on either item. He also testified that Monroe's blood was found on Steinhoff's shoe and that Steinhoff's DNA was found on a T-shirt and towel recovered from the residence. The analyst specifically testified that "obtaining DNA from touched items is generally more difficult[] than from bodily fluids," but if an object "is regularly used or handled by somebody, [like] by a homeowner, [then he] would generally expect to find their DNA on that item."

¶16 Steinhoff did not testify at the trial, but the jury heard portions of his interviews with law enforcement. In these interviews, Steinhoff first denied knowing Gunder or Monroe, but he later told law enforcement that he knew them, that it was his idea to meet Monroe, and that he participated in Monroe's beating. Steinhoff explained that he believed that Monroe was involved in child sex trafficking, and Steinhoff wanted to "get to the bottom of this" and "get information out of him." Steinhoff told police that when he left the trailer, Monroe was lying face down on the floor with a broken window on top of him.

¶17 Steinhoff called a forensic pathologist who had reviewed Monroe's numerous autopsy photos. The pathologist opined that "[t]he worst and most

devastating [injuries were] the occipital injury, which is the back of the head, where there were fractures and bleeding and damage to the brain" and the injury "over the left ear where there was damage to the overlying scalp and skin and then [a] skull fracture." She testified, "It's my opinion that the head injuries were the ultimate fatal injuries." According to the pathologist, a hammer or a propane tank—items that were found in or around the trailer—could have caused those head injuries. On cross-examination, the pathologist clarified that she did not "think we can or need to separate which [head injury] was ultimately fatal."

¶18 The jury found Steinhoff guilty of first-degree intentional homicide. During the responsibility phase of the trial, the jury found that Steinhoff did not have a mental disease or defect at the time he committed the homicide. The circuit court sentenced Steinhoff to life imprisonment without the possibility of extended supervision. Steinhoff appeals.[5]

---

[5] While this appeal was pending and after briefing was complete, Steinhoff filed multiple pro se motions seeking to discharge his appointed counsel, dismiss his WIS. STAT. RULE 809.30 direct appeal without prejudice, and extend the time for him to file a postconviction motion either pro se or with retained counsel. Appellate counsel also moved to withdraw. We sought responses from both the Office of the State Public Defender (SPD) and the State on these issues. Having considered those submissions, we acknowledged that Steinhoff had a right to voluntarily dismiss his appeal but that the dismissal would not be "without prejudice." We determined that Steinhoff had not shown good cause to reinstate his RULE 809.30 postconviction motion deadline and denied that part of his motion by order dated April 9, 2026.

With knowledge that we would not extend this deadline and that the SPD would not appoint new or successor counsel, Steinhoff was directed to confirm how he wanted to proceed. Steinhoff responded, reluctantly, that he would proceed with present counsel in the current appeal. His letter also included additional pro se appellate arguments, despite being represented. We do not consider those arguments in this appeal. *See Johnson v. Johnson*, 2016 WI App 60, ¶26, 371 Wis. 2d 388, 885 N.W.2d 603 (declining to consider a pro se motion filed by a litigant when the litigant was represented by counsel at the time); *State v. Debra A.E.*, 188 Wis. 2d 111, 138, 523 N.W.2d 727 (1994) (addressing "hybrid" representation and providing that an appellate court may, but need not, consider pro se briefs filed by a represented appellant).

**DISCUSSION**

## I. Third-party perpetrator evidence

¶19 Steinhoff argues, first, that the circuit court's "exclusion of Steinhoff's alternate suspect theory"—i.e., the exclusion of evidence suggesting that Welch was the one responsible for Monroe's death—"deprived him of his constitutional right to present a defense." (Formatting altered.) We review a circuit court's decision to exclude evidence for an erroneous exercise of discretion. *State v. Wilson*, 2015 WI 48, ¶47, 362 Wis. 2d 193, 864 N.W.2d 52. However, when the decision to exclude evidence implicates a defendant's constitutional right to present a defense, the decision presents a question of constitutional fact that we review de novo. *Id.*

¶20 To allege that a known third person committed a crime, the defendant must show that there is "a 'legitimate tendency' that the third person could have committed the crime." *Denny*, 120 Wis. 2d at 623 (citation omitted). To establish a "legitimate tendency," three factors must be present: motive, opportunity, and direct connection. *Wilson*, 362 Wis. 2d 193, ¶51. While a defendant need not "establish the guilt of third persons with that degree of certainty requisite to sustain a conviction," *Denny*, 120 Wis. 2d at 623, a defendant must show "more than mere possibility" that the third party was the one responsible for the crime, *Wilson*, 362 Wis. 2d 193, ¶83. "[E]vidence that simply affords a possible ground of suspicion against another person should not be admissible." *Denny*, 120 Wis. 2d at 623.

¶21    Here, the State concedes that Steinhoff has satisfied the opportunity prong of the ***Denny*** test,[6] which "asks whether the alleged third-party perpetrator *could have* committed the crime in question" because, for example, "the defendant was at the crime scene or known to be in the vicinity when the crime was committed." *See **Wilson***, 362 Wis. 2d 193, ¶65.  As Steinhoff argues, "Welch was present during [Monroe's] 'interrogation,' and he remained at the scene after Steinhoff and Turgeson left when … Gunder said [Monroe] appeared to still be alive."  Given the State's concession, we will assume, without deciding, that Steinhoff has established the opportunity prong, and we will not address it further.

¶22    Regardless of whether Welch had the opportunity to commit the crime, however, we conclude that Steinhoff falls short on the remaining two criteria necessary to establish a viable third-party perpetrator defense—motive and direct connection.  Therefore, Steinhoff's ***Denny*** motion was properly denied.

*A.  Motive*

¶23    The motive prong requires a showing that the third party had a "plausible reason to commit the crime." ***Wilson***, 362 Wis. 2d 193, ¶57.  Steinhoff asserts that

> [g]iven Welch's history of irrational rage and antisocial behavior, it is entirely plausible that Welch's mind was, as he said at a prior sentencing hearing, going too fast and that

---

[6] In its response brief, the State notes that it "does not argue [on appeal] that Steinhoff failed to meet the opportunity prong," but it acknowledges that the circuit court "was also correct when it explained below that Steinhoff's showing of opportunity was not particularly strong" because the court concluded that "it seems more likely than not that [Monroe was] either dead or dying by the time Mr. Steinhoff and Mr. Turgeson le[ft] the trailer" and, to the court, "that sort of weakens the opportunity."  Thus, the State explains that "[i]t does argue that Steinhoff's showing of opportunity is not 'so strong that it will affect the evaluation of the other prongs.'" *See **State v. Wilson***, 2015 WI 48, ¶64, 362 Wis. 2d 193, 864 N.W.2d 52.

> it caused him to lash out against [Monroe] after Steinhoff
> and Turgeson left the residence, perhaps with the hammer,
> the handle of which was found to contain his DNA.

In support of his argument, Steinhoff presented eight instances that he says demonstrate "Welch's irrational rage" that "led to acts of violence and threats." Among these are five instances of domestic violence, including a conviction for substantial battery and a charge of misdemeanor battery; robbery with use of force; substantial battery for hitting a man in the head with a rock; and criminal damage to property. Steinhoff asserts that "all of" these instances were "done for no meaningful reason other than an inability [of Welch] to control his own frustrations." Steinhoff also identifies Welch's statement during a sentencing hearing in a previous case, when he said, "I don't think straight sometimes. I mean my mind goes too fast and I don't know what to do next, and so that's when I lash out." (Formatting altered.) According to Steinhoff, "there is reason to think Welch was not thinking straight on the night [Monroe] was murdered" because Gunder "told police how 'panicked' Welch was during the entirety of the events."

¶24 We reject Steinhoff's assertion that Welch had a *plausible* reason to murder Monroe. Evidence that Welch committed violent crimes in the past and that Welch was allegedly panicking that evening is insufficient to establish a motive *to kill Monroe*. The first problem with Steinhoff's argument is that he contends Welch lashes out when he is frustrated. However, the only evidence regarding Welch's state of mind was Gunder's testimony that she thought Welch was "panicking" because he was "rocking back and forth on his bed." Assuming Welch was panicky, panicking is not the same as being frustrated, and Steinhoff does not suggest any reason Welch would have been frustrated with Monroe, whom he did not know, to the point of lashing out.

¶25 Second, Welch's past crimes are not similar to Monroe's murder. As the State argues, "Steinhoff requires this Court to speculate as to Welch's emotional state during all of his past crimes—which took a variety of forms and occurred in a variety of contexts." Based on our review of Welch's past crimes and instances of violence, Welch was either living with the victim or had another type of relationship with the victim and some interaction between them triggered Welch's behavior. In other words, as the circuit court explained, the incidents "appear to be spontaneous eruptions of violence based on an interaction and not" instances where Welch was "going around … hurting people because that's what he desires to do." In contrast, Welch had never met Monroe before that evening, and, again, there is no suggestion that anything occurred between the two men that would have prompted Welch to react violently.

¶26 Finally, we agree with the State that Steinhoff's evidence of Welch's past crimes is merely impermissible propensity evidence that "[h]e offers … solely to show that Welch is the type of person who lashes out violently for no apparent reason, and that Welch acted in conformance with that character trait in this case," which is impermissible under WIS. STAT. § 904.04(2). *See Sullivan*, 216 Wis. 2d at 782 & n.10. Steinhoff's suggestion that because Welch has a propensity for committing violent crimes when in a heightened emotional state, he may have acted in accordance with that character trait by killing Monroe, absent any provocation, is entirely speculative and does not demonstrate a "plausible reason" for why Welch would have killed Monroe, specifically. *See Wilson*, 362 Wis. 2d 193, ¶57; *Denny*, 120 Wis. 2d at 623.

### B. Direct connection

¶27 The direct connection prong of the *Denny* test requires the defendant to present evidence "that the alleged third-party perpetrator actually committed the crime, directly or indirectly." *Wilson*, 362 Wis. 2d 193, ¶59. "Logically, direct connection evidence should firm up the defendant's theory of the crime and take it beyond mere speculation." *Id.* "[C]ourts must assess the proffered evidence in conjunction with all other evidence to determine whether, under the totality of the circumstances, the evidence suggests that a third-party perpetrator *actually committed* the crime." *Id.*, ¶71. Our supreme court has explained that self-incriminating statements or exclusive control of the weapon used may establish a direct connection; however, "[m]ere presence at the crime scene or acquaintance with the victim … is not normally enough to establish direct connection." *Id.*, ¶72.

¶28 Steinhoff presents the following evidence that he argues establishes that "Welch had opportunity, motive, and a direct connection to [Monroe's] murder": (1) "Welch admitted to police that he was present in his [trailer] when [Monroe] was beaten"; (2) "Welch's sweatshirt was covered with [Monroe's] blood"; (3) "[p]olice recovered a hammer on the property," and "Welch's DNA was found on the handle of the hammer while Steinhoff and Turgeson were excluded"; (4) "[a] blood stain on the head of [the] hammer contained DNA consistent with [Monroe]"; (5) "Gunder … told police she believed [Monroe] was alive when Steinhoff and Turgeson left the trailer hours before Welch called police" and "also said she thinks [Monroe] died as a result of being struck in the head with the hammer, which she referred to as 'the murder weapon'"; (6) Gunder told police that Welch wanted to drive with her and Steinhoff to pick up Monroe and bring him to the mobile home that night and that Welch knew they were

"going to find someone"; (7) Gunder said that when Welch came home, he was "all excited and hugged me"; and (8) "[a]n autopsy revealed that [Monroe] suffered a 'deep penetrating laceration of the back of the head with underlying depressed skull fracture of the occipital bone' consistent with being struck in the back of the head with a hammer" and the autopsy report "opined that the skull fracture was very likely the fatal injury."[7]  In summary, "[g]iven Welch's presence

---

[7] We note that the State identifies several concerns with Steinhoff's above appellate arguments.  First, the State explains that "Steinhoff says that he presented evidence in his [***State v. Denny***, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984),] motion that 'Welch's sweatshirt was covered with [Monroe's] blood,'" but the State observes that "nowhere in Steinhoff's ***Denny*** motion did he mention a sweatshirt, much less one covered in blood."  Thus, it contends that "Steinhoff's arguments regarding a sweatshirt should be disregarded because they are, at the very least, forfeited" and because this court reviews "the circuit court's denial of the ***Denny*** motion based on the offer of proof Steinhoff provided to the circuit court—which did not include anything about a sweatshirt."  *See* ***Schonscheck v. Paccar, Inc.***, 2003 WI App 79, ¶¶10-11, 261 Wis. 2d 769, 661 N.W.2d 476 (stating that we do not "blindside [circuit] courts with reversals based on theories which did not originate in their forum" (citation omitted)); *see also* WIS. STAT. § 901.03(1)(b) (stating that error will not be predicated on a ruling excluding evidence unless "the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked"); ***State v. Winters***, 2009 WI App 48, ¶¶17-19, 317 Wis. 2d 401, 766 N.W.2d 754 (holding that a party challenging a circuit court's ruling excluding evidence is obligated to make an offer of proof).

In his reply brief, Steinhoff admits that appellate "[c]ounsel … inadvertently stated that Steinhoff's ***Denny*** motion proffered evidence that crime lab testing showed that [Monroe's] blood was on one of Welch's shirts," but "[t]his evidence was not included in Steinhoff's ***Denny*** motion and was not before the circuit court when it decided the motion."  However, he explains, "a Wisconsin State Crime Lab analyst testified at trial that blood on one of Welch's shirts found at the scene revealed the presence of [Monroe's] DNA," and "[a] summary of the DNA results was introduced as an exhibit at trial."

Second, the State observes that Steinhoff says that the autopsy report for Monroe "opined that the skull fracture was very likely the fatal injury."  However, the State explains that "the autopsy report does not identify which of [Monroe's] many injuries was likely the fatal one, nor does it say whether any of the injuries are consistent with any type of weapon."  Further, the State notes that "Steinhoff's own forensic expert at his trial confirmed that 'I don't think we can or need to separate which [of the injuries to Monroe] was ultimately fatal.'"  (Alteration in original.)

Again, in his reply brief, Steinhoff explains that appellate "[c]ounsel inadvertently stated in his initial brief that the autopsy indicated that a fracture to [Monroe's] skull was very likely the fatal injury," but he then claims that "assertion was from Dr. Lindsey Thomas, a forensic pathologist called by the defense."  *But see supra* ¶17.

(continued)

14

at the crime scene, his apparent knowledge of why [Monroe] was brought there, his opportunity to be alone with [Monroe] before he died, the DNA results from the hammer, his sweatshirt soaked with [Monroe's] blood, his emotional state that night, and his history of out-of-control rage," Steinhoff argues that "a reasonable person could surely think that Welch committed the murder."

¶29 We agree with the State and the circuit court that Steinhoff has not made a sufficient showing that Welch "actually committed the crime." *See Wilson*, 362 Wis. 2d 193, ¶59. We concur with the court that Steinhoff has

---

We need not decide whether Steinhoff has forfeited these arguments because we have the authority to disregard a forfeiture and address an allegedly forfeited claim on the merits. *See State v. Erickson*, 227 Wis. 2d 758, 766, 596 N.W.2d 749 (1999) ("[T]he [forfeiture] rule is one of judicial administration and … appellate courts have authority to ignore the [forfeiture].").

Third, and finally, the State notes that "Steinhoff relies in part on his characterization of statements Gunder allegedly made in her interviews with police," but the State observes that Steinhoff "did not appear to have included transcripts or recordings of those interviews with his *Denny* motion, nor do such interviews appear to be in the appellate record." The State further observes that "aside from citing his *Denny* motion, Steinhoff does not provide any record cites for the interview statements he relies upon."

We agree with the State that in his appellate briefs, Steinhoff cites only to his motion to admit third-party perpetrator evidence to support Gunder's alleged statements to police, but his motion also fails to provide any evidentiary support for these statements. We may refuse to consider arguments that are unsupported by citations to the record. *Alswager v. Roundy's Inc.*, 2005 WI App 3, ¶15, 278 Wis. 2d 598, 692 N.W.2d 333 (2004); *see also Grothe v. Valley Coatings, Inc.*, 2000 WI App 240, ¶6, 239 Wis. 2d 406, 620 N.W.2d 463 (explaining that it is not our responsibility to search the record to seek out evidence in support of a party's argument). Further, to the extent that necessary material is missing from the record, it is the appellant's responsibility to ensure that the record on appeal is complete, and any missing material is presumed to support the circuit court's ruling. *See Fiumefreddo v. McLean*, 174 Wis. 2d 10, 26-27, 496 N.W.2d 226 (Ct. App. 1993).

In his reply brief, Steinhoff also directs this court to consider arguments made by the parties outside of the appellate briefs. While we certainly must consider relevant portions of the record to conduct our review, to the extent Steinhoff's comments are an attempt to incorporate circuit court submissions into his appellate brief by reference, that suggestion is unacceptable. *See Bank of Am. NA v. Neis*, 2013 WI App 89, ¶11 n.8, 349 Wis. 2d 461, 835 N.W.2d 527; *State v. Flynn*, 190 Wis. 2d 31, 58, 527 N.W.2d 343 (Ct. App. 1994). We could also reject Steinhoff's challenge on this basis. *See Flynn*, 190 Wis. 2d at 39 n.2.

presented "absolutely no evidence of any interaction between George Welch and [Monroe]." Further, as the State argues, Steinhoff offers "little beyond the fact that Welch was present during some of the time Steinhoff and Turgeson were beating [Monroe]," "[b]ut 'mere presence' at the crime scene is insufficient to establish direct connection." *See id.*, ¶72.

¶30 Beyond Welch's presence in his own home, Steinhoff appears to stake his entire third-party perpetrator position on Welch's DNA found on the hammer and Monroe's blood on Welch's clothing "found at the scene." However, as the circuit court reasoned, it was not "unexpected" that Welch's DNA would be on the hammer because "[i]t's his residence" and the hammer belonged to Welch. Perhaps under different facts, the existence of DNA on the hammer would create a direct connection to the crime, but, here, the DNA evidence "simply affords a possible ground of suspicion against" Welch. *See Denny*, 120 Wis. 2d at 623.

¶31 In terms of the clothing, as an initial matter, it is not clear what item of clothing is the focus of Steinhoff's arguments. In his reply brief, Steinhoff refers to "one of Welch's shirts" and cites a page of the transcript where the DNA analyst was discussing a "T-shirt." In his brief-in-chief, however, Steinhoff clearly refers to a "sweatshirt," and the analyst discussed a "sweatshirt"—also referred to as a "[g]rey hooded zip up sweatshirt" in the record—immediately before his testimony about the "T-shirt."

¶32 Regardless of whether Steinhoff means to refer to one shirt or the other, or both, he fails to identify any evidence connecting the clothing to both Welch *and* the crime. In other words, as the State recognized, "Steinhoff has not included any references to the record to provide any additional context, such as where the sweatshirt was located [or] whether anyone was wearing it," and the

same is true of the T-shirt. Although the sweatshirt and the T-shirt both had Welch's and Monroe's DNA on them, as the State notes, that fact is "unsurprising given that by all accounts Welch's belongings were scattered around the house."

¶33 In summary, Steinhoff failed to establish a direct connection between Welch and Monroe's murder. Steinhoff's theory is that Monroe survived the beating and was alive when Steinhoff left the trailer but that Welch later killed Monroe, presumedly when Gunder was sleeping. However, absent any evidentiary support, Steinhoff's theory remains purely speculative and nothing more than a "mere possibility." *See Wilson*, 362 Wis. 2d 193, ¶83. Therefore, the circuit court did not err by denying Steinhoff's *Denny* motion.

## II. Other-acts evidence

¶34 Next, Steinhoff argues that the circuit court erroneously exercised its discretion by denying Steinhoff's motion to admit other-acts evidence. As Steinhoff explains in his brief-in-chief, "[i]n conjunction with his *Denny* motion, Steinhoff filed an 'other acts' motion seeking admission of the same eight instances of Welch's prior acts of violence." *See supra* ¶23. We apply *Sullivan*'s three-prong analysis to determine the admissibility of other-acts evidence. *Sullivan*, 216 Wis. 2d at 771. Other-acts evidence is properly admitted if: (1) it is offered for a permissible purpose under WIS. STAT. § 904.04(2); (2) it is relevant under the two relevancy requirements found in WIS. STAT. § 904.01; and (3) its probative value is not substantially outweighed by the risk of unfair prejudice under WIS. STAT. § 904.03. *Sullivan*, 216 Wis. 2d at 772-73. The *Sullivan* test is conjunctive, meaning that the evidence is admissible only if all three prongs are satisfied. *See id.*; *State v. Marinez*, 2011 WI 12, ¶19, 331 Wis. 2d 568, 797 N.W.2d 399. We review a circuit court's denial of a motion to admit other-acts

evidence for an erroneous exercise of discretion. *See State v. Hunt*, 2003 WI 81, ¶34, 263 Wis. 2d 1, 666 N.W.2d 771. We will uphold a court's evidentiary ruling if it "examined the relevant facts, applied a proper standard of law, used a demonstrated rational process, and reached a conclusion that a reasonable judge could reach." *Id.*

¶35 Given our determination above regarding the *Denny* evidence, we conclude that Steinhoff is unable to satisfy the second prong of the *Sullivan* analysis with regard to evidence of Welch's past crimes. As we have explained previously, "[i]f evidence of third-party culpability would not be admissible at trial under *Denny*, then it could not be material to the issue of guilt or innocence," i.e., it is not a fact of consequence. *See State v. Vollbrecht*, 2012 WI App 90, ¶25, 344 Wis. 2d 69, 820 N.W.2d 443. The relevancy prong of the *Sullivan* analysis asks (1) "whether the evidence relates to a fact or proposition that is of consequence to the determination of the action"; and (2) "whether the evidence has a tendency to make a consequential fact more probable or less probable than it would be without the evidence." *Sullivan*, 216 Wis. 2d at 785-86; *see also* WIS. STAT. § 904.01.

¶36 Steinhoff's failure to establish the elements required under the *Denny* analysis renders the evidence of Welch's prior crimes immaterial to the question of Steinhoff's guilt or innocence and thus requires that the evidence be excluded under the second prong of *Sullivan*. Stated clearly, without a legal basis to name Welch as a possible suspect at trial, Welch's criminal history is irrelevant to the ultimate question in the case. *See Vollbrecht*, 344 Wis. 2d 69, ¶25; *but see* WIS. STAT. § 906.09; *State v. Smith*, 203 Wis. 2d 288, 297, 553 N.W.2d 824 (Ct. App. 1996) (stating that "the law presumes that the number of convictions is relevant to a witness's credibility" and that, in Wisconsin, "witnesses may be asked if they have been convicted of a crime, and if the answer is yes, the number

18

of convictions," but "[t]he nature of the convictions is not to be discussed"). Therefore, the circuit court did not erroneously exercise its discretion by denying Steinhoff's motion to admit other-acts evidence, and we affirm Steinhoff's judgment of conviction.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

19